565 S.E.2d 298

The STATE, Respondent,

v.

Troy Alan BURKHART, Appellant.

No. 25484.

Supreme Court of South Carolina.

Heard Dec. 13, 2001.

Decided June 17, 2002.

Deputy Chief Attorney Joseph L. Savitz, III, of South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Derrick K. McFarland, all of Columbia; and Solicitor Druanne D. White, of Anderson, for respondent.

Chief Justice TOAL.

Troy Alan Burkhart ("Appellant") appeals his convictions on three counts of murder and three counts of possession of a firearm during commission of a violent crime for which he was sentenced to death. We reverse.

## FACTUAL/PROCEDURAL BACKGROUND

On January 13, 1998, the grand jury for Anderson County indicted Appellant for the murders of Shane and Stacy Walters, half-brothers, and Sonya Cann. In addition to the three counts of murder, Appellant was indicted on three counts of possession of a firearm during the commission of a violent crime. Although Appellant admitted to shooting and killing Shane, Stacy, and Sonya, he pled not guilty, claiming he killed them all in self-defense.

After a two week trial beginning on March 6, 2000, the jury convicted Appellant on all three counts of murder and all three counts of possession of a firearm during commission of a violent crime. The following day, the jury recommended Appellant be sentenced to death, citing the murder of two or more persons pursuant to one scheme or course of conduct as the statutory aggravator. The trial judge affirmed their recommendation and sentenced Appellant to death.

According to the record, Appellant met the Walters brothers just a few days before they were killed. It all began when a mutual friend, Paul Zastrow, introduced Appellant and the Walters when they met by chance at Zastrow's house on Friday, November 14, 1997. Appellant did not know the Walters before that weekend and claims he did not know Sonya Cann at all. Appellant owned and managed a bar called Traditions, and the Walters set up mobile homes for a living.

A group of Clemson students had rented Appellant's bar for a private party that weekend, but Appellant was having trouble with his septic tank. Zastrow suggested that the Walters might be able to help fix it. Appellant accepted the offer and Zastrow and both Walters arrived at Traditions Friday evening, November 14, to work on the septic tank. They built a bonfire and spent the night working on the septic tank, drinking, doing drugs (methamphetamine and marijuana), and talking about deer hunting. An impromptu party developed as several other friends showed up and joined them.

Although Burkhart often carried a sidearm (because, he testified, "I deal with money and liquor and I'm in a secluded location")[1], he had never been hunting, but had become interested in learning to hunt in the weeks preceding these events. After the party broke up, Appellant, Shane, Stacy, and another friend drove around in the woods with their guns looking for deer. Apparently, the group saw and startled a deer at some point before deciding to go home. Shane took Appellant home and told him he could help him again with the septic tank on Saturday if necessary.

---

1. Appellant purchased a Colt .45 automatic—the gun he shot Shane, Stacy, and Sonya with—at a pawn shop a few years before this episode.

The next day, Saturday, November 15, went much like the previous evening. Appellant picked up Shane at Paul Zastrow's house around 9:00 p.m. and they drove to Traditions to work on the septic tank. Many of the same people from the night before returned, and the group drank alcohol and did drugs until the bar closed, just as they had on Friday night. Apparently, Shane and Appellant agreed to go hunting the following morning. Appellant dropped Shane off and went home to prepare to go hunting. Appellant waited on Shane, but he never showed up. Appellant drove to Shane's house twice and knocked on the door, but got no answer. Assuming Shane fell asleep, Appellant drove to Paul Zastrow's house for coffee and then drove home to go to sleep.

That afternoon, Sunday, November 16, Shane and his wife Vicky had some friends over to watch car races on television. Appellant called Shane several times, and he and Paul Zastrow went over to the Walters' trailer around 4:00 p.m. Stacy came in from work a short time later. At some point, Shane, Stacy, and Appellant decided to go "four-wheeling" in Shane's truck. Appellant had his gun with him in case they went hunting, and Shane had his rifle. The three men were drinking and doing drugs at this time.

At some point after four-wheeling, the threesome drove over to Tammy Steele's house where they continued partying. According to Tammy, Appellant's wife called him on his mobile phone while he was there and, after speaking to her, Appellant said he did not want to go home that night. Tammy also testified that Appellant mentioned that his business was not doing well and thanked Shane and Stacy profusely for helping him with the septic tank. At some point, Tammy's sister, Danielle, came over. Some time later, Paul Zastrow contacted the group and asked if Appellant could bring him some beer from Traditions. Appellant agreed to do so, and he, Shane, and Danielle went by Traditions and then onto Zastrow's, where they did more drugs and drank with Zastrow and his girlfriend. While they were gone, Tammy testified that she and Stacy had sex and that the condom Stacy was wearing broke and they could not find it.[2]

---

2. This testimony is relevant because Stacy's autopsy revealed he was wearing a condom at the time of his death which Appellant claims

Shane, Danielle, and Appellant returned to Tammy's house until the party disbursed sometime after 5:00 a.m. Shane, Stacy, and Appellant left Tammy's house in Shane's truck. After they left her house, Shane drove them to Sonya Cann's house to pick her up. Sonya sat in the front of the truck between Shane and Appellant and Stacy sat on the backseat of the truck, behind Appellant on the passenger side. They drove around for a little while, eventually going up to an isolated kudzu field known to everyone in the truck but Appellant.

From this point on, Appellant testified that the atmosphere in the truck changed dramatically. He related the ensuing events as follows:

When we got to the top, we parked and I believe there was some beer opened and Sonya handed Stacy some, what I believed to have been some more methamphetamine.... Stacy was, was fixing it ... on a CD case. And I said to Shane, I said, "Are there any deer here, where are the deer?" He didn't answer, but Sonya said, "There ain't no deer here, this is a scattering field.".... I didn't know what to think of that. I guess I just let it go and didn't think much more about it. And I ... started a conversation about the restaurant. Shane and I had talked about him knowing someone that could help me that wasn't a bank. And I asked him a little more about that. And he told me that he had that worked out and that I didn't have to worry about that.... That's when Stacy handed Shane a cassette case with some what I thought to be methamphetamine on it.... He held it for a moment and passed it to me. When I got it, it still had four lines or four piles of powder on it.... [O]n occasion when we had done drugs before, when I got it, there was only one line left on it. I thought it was strange that there were four and it had been passed through the other three.... As he passed it to me, he asked me if I had ever wronged anyone. And I said, "No, what do you mean by that?" Then he said, "Have you ever wronged your Uncle Ronnie?"

corroborates his story that Stacy threatened him with homosexual rape. The State refuted this evidence by arguing the condom was the same one he used with Tammy earlier in the night.

Appellant claims that this question "struck fear into [his] soul." Appellant and his father considered Ronnie, who had a reputation for being a somewhat ruthless drug smuggler, an enemy.[3] Appellant's testimony continued:

> [Shane] said that he and Ronnie had this thing worked out, that he had gotten money from drugs in Florida.... [Shane] said all he had to do was take care of me.... Then [Shane] said, "it's time to get this over with." Then he pulled out the gun and told me to get the hell out of the truck.... Stacy had had [sic] me around the neck and had a knife in his hand and said, "we're going to make you squeal like a pig, boy." ... Sonya said, "Yeah, baby, make him squeal like a pig." ... I lunged for the gun and then the gun went off.... I was able to get the gun and I just shot. I just shot.... I couldn't say which direction.... I shot until it wouldn't shoot.... I opened the driver's door and ... I pushed Shane and Sonya out of the truck.... I heard what sounded like another door slamming.... I looked on the seat and saw the other clip for the gun was there, and I put the other clip in the gun.... I couldn't get it to work. I couldn't get the bullet to go in. And I remember trying to get it to work and bullets coming out, and I remember it going off. Then I got out of the truck to see what it was that I may have heard, and I couldn't see anything. I went around and I pulled Stacy out of the truck.... I got in the truck and got the hell out of there.... I thought I was going to be raped and killed.

Shane Walters was shot six times, including one fatal wound to the back of the head. Stacy Walters was shot in the right temple and right cheek, either of which would have been fatal. Sonya Cann was shot three times, including fatal wounds to the right temple and through the left eye.

The State contended, contrary to Appellant's account, that the shots that killed Shane and Sonya were fired after they

---

**3.** Ronnie Burkhart and his brother, Appellant's father, Warren Burkhart, hated each other so much, according to an attorney with first-hand knowledge of their relationship, that they could not be left alone in a courtroom together without getting into a fist fight. Ronnie seemed determined to ruin his brother financially and there were several lawsuits between the two brothers. Appellant's relatives referred to Ronnie as "very vicious" and as an "evil person."

were already incapacitated, lying on the ground outside the truck, and that Appellant had stomped Sonya and Stacy with his boot after he shot them. Still, the State's pathologist who advanced these theories could not rule out self-defense, particularly in view of the amount of drugs and alcohol consumed. A defense pathologist testified that the shootings could have occurred exactly as Appellant described.

On cross-examination, Appellant unequivocally denied the State's accusations. He testified, "I did not stomp anyone and I did not shoot anyone on the ground." Appellant described the episode as a five-second fight for his life against Stacy, Shane, and Sonya. According to Appellant, he had no choice but to kill them all in self-defense.

Once he was out of danger, Appellant claims he became concerned for the safety of his father and his wife. He left the kudzu field in Shane's truck and called his father from a cell phone. Appellant testified that he drove directly to his father's house, that he and his father got into his father's truck, and then drove to his own house to get his wife. Appellant told his wife that Ronnie had tried to kill him and that he had shot three people defending his life, describing it as a "scene out of *Deliverance*." [4] From his house, Appellant, his father, and his wife, drove to the Seneca Police Department.

Appellant claims to have told the police the same story he told at trial when he led them to the bodies later that morning, including the *Deliverance* "squeal like a pig" threat of homosexual rape. This is significant because Stacy Walters' autopsy later revealed he was wearing a condom at the time he was killed which Appellant could not have known when he took the police to the scene. The State speculated it was the same condom Stacy wore when he had sex with Tammy Steele earlier in the evening, but the defense argued this was highly unlikely as hours had passed since he had sex with Tammy, and that this fact corroborated Appellant's self-defense claim.

---

4. James Dickey, *Deliverance*, Boston: Houghton Mifflin, 1970. Dickey's best-selling novel, *Deliverance*, set on a white water river in the Georgia wilderness, has become famous, not only for its masterful prose, but for its vivid account of a sexual assault of a man by a group of rough and brutal men he and his three friends encountered while canoeing the river.

At trial, the judge instructed the jury on murder, voluntary manslaughter and self-defense. Defense counsel submitted a number of written requests for the judge to charge concerning self-defense, two of which would have charged the jury that the State must prove the defendant did not act in self-defense *beyond a reasonable doubt.* Instead, in addition to the basic four element self-defense instruction from *State v. Davis,* 282 S.C. 45, 317 S.E.2d 452 (1984), the judge charged, "[t]he defendant, ladies and gentlemen, is not required to prove the defense of self-defense. All burdens of proof in this case are on the State and remain with the State."

The judge did not charge the reasonable doubt instruction submitted by the defense. Defense counsel objected that the charge given did not comport with *State v. Wiggins,* 330 S.C. 538, 500 S.E.2d 489 (1998)(requiring the State to disprove self-defense beyond a reasonable doubt). The judge refused to add to the charge, finding the charge he had given to be sufficient in light of present law relating to burden of proof and self-defense. After the jury found Appellant guilty, defense counsel moved for a new trial, based once again on the judge's failure to "to charge that the state has the burden of proving beyond a reasonable doubt the absence of the elements of self-defense," citing *Wiggins* for support. The judge denied defense counsel's motion, relying on his earlier ruling.

As discussed, Appellant was convicted on all three counts of murder and possession of a firearm during commission of a violent crime at trial and sentenced to death. On appeal, Appellant raises the following issue:

Did the trial judge commit reversible error in refusing to charge the jury that the State bore the burden of disproving self-defense beyond a reasonable doubt?

### LAW/ANALYSIS

Appellant argues the trial court committed reversible error when it refused to charge the jury that the State bore the burden of disproving self-defense beyond a reasonable doubt. We agree.

If there is any evidence in the record to support self-defense, the issue should be submitted to the jury. *State v.*

*Hill,* 315 S.C. 260, 433 S.E.2d 848 (1993). In general, the trial judge is required to charge only the current and correct law of South Carolina. *Cohens v. Atkins,* 333 S.C. 345, 509 S.E.2d 286 (Ct.App.1998). A jury charge is correct if it contains the correct definition of the law when read as a whole. *Keaton v. Greenville Hosp. Sys.,* 334 S.C. 488, 514 S.E.2d 570 (1999). The substance of the law must be charged to the jury, not particular verbiage. *Keaton.* "Current law requires the State to disprove self-defense, once raised by the defendant, beyond a reasonable doubt." *Wiggins,* 330 S.C. at 544, 500 S.E.2d at 493. Finally, to warrant reversal, a trial judge's refusal to give a requested charge must be both erroneous and prejudicial. *Ellison v. Parts Distributors, Inc.,* 302 S.C. 299, 395 S.E.2d 740 (Ct.App.1990).

This Court recently clarified the State's burden when a defendant raises self-defense:

> In *Wiggins,* we specified for the first time, though not in the context of a jury charge, that the State has the burden of disproving self-defense. . . . When self-defense is properly submitted to the jury, the defendant is entitled to a charge, if requested, that the State has the burden of disproving self-defense by proof beyond a reasonable doubt.[5]

*State v. Addison,* 343 S.C. 290, 293, 540 S.E.2d 449, 451 (2000).[6]

---

**5.** Nearly all state courts considering the prosecution's burden of proof have held the defendant is entitled to such a charge. *See, e.g., Williams v. State,* 245 Ga.App. 670, 538 S.E.2d 544 (2000); *Miller v.State,* 720 N.E.2d 696 (Ind.1999); *State v. Osborne,* 775 So.2d 607 (La.App. 4th Cir. 2000); *Commonwealth v. Beauchamp,* 49 Mass.App.Ct. 591, 732 N.E.2d 311 (Mass.2000); *State v. Plante,* 623 A.2d 166 (Me.1993); *State v. Cooper,* 561 N.W.2d 175 (Minn.1997); *State v. Santamaria,* 145 N.H. 138, 756 A.2d 589 (2000); *State v. Garcia,* 18 P.3d 1123 (Utah App. 2001); *State v. Walden,* 131 Wash.2d 469, 932 P.2d 1237 (1997).

**6.** Because *Addison* was decided shortly after Appellant's trial, we do not rely on it alone in this case. *Wiggins,* by itself, is sufficient to support our analysis and ultimate decision in this case. *Addison* does, however, clarify what this Court stated in *Wiggins* and provides an instructive description of the *Wiggins* decision. The only change *Addison* makes is to place a limitation on when the charge must be given. After *Addison,* the charge set out in *Wiggins* is required only *if requested.* Presumably then, before *Addison,* the *Wiggins* charge must have been given whenever a self-defense charge was merited.

■ In this case, the trial judge charged the jury on the four elements of self-defense pursuant to *State v. Davis* and, additionally, charged that the defendant did not have to prove self-defense and that the burden remained on the State at all times. The State argues that this charge, coupled with the other charges given by the judge, complied with *Wiggins* by conveying to the jury that all of the evidence, including evidence of self-defense, must be considered in the jury's calculation of reasonable doubt.

We disagree with the State. We do not believe the trial judge's self-defense charge adequately conveyed that the State has the burden of *disproving* self-defense *beyond a reasonable doubt* as required under *Wiggins*. It is the substance of the law and not the "particular verbiage" of a charge that determine whether the charge is adequate, and, in this case, the trial judge's charge did not accurately communicate the "substance of the law" as pronounced in *Wiggins*. *Keaton*.

In *State v. Fuller*, this Court made clear that it did not intend *Davis* to be the *exclusive* self-defense charge. 297 S.C. 440, 377 S.E.2d 328 (1989). This Court removed the burden of proving self-defense from the defendant and placed it instead on the State in *Davis*. In *Wiggins*, this Court eliminated any confusion lingering since *Davis* by enunciating the State's precise burden clearly: "current law requires the State to disprove self-defense, once raised by the defendant, beyond a reasonable doubt." 330 S.C. at 544, 500 S.E.2d at 492.

Under *Wiggins* and now *Addison*, when self-defense is properly submitted to the jury, the defendant is entitled to a charge, if requested, that the State has the burden of disproving self-defense by proof beyond a reasonable doubt. *Addison; Wiggins*. The instruction regarding burden of proof in this case did not reference the beyond reasonable doubt standard, required arguably since *Davis*, and without a doubt since *Wiggins*. Further, the instruction did not include any language indicating that the State must *disprove* Appellant's self-defense claim or, conversely, that the State must prove Appellant did not act in self-defense.

There is a difference between the charge given in this case and the charge required by *Wiggins* and now, if requested, by *Addison*. Charging that the State must disprove Appellant's

self-defense claim is a vastly clearer description of the burden of proof than simply charging that the defendant does not need to prove self-defense, as the trial judge charged in this case. Charging that the State must disprove self-defense or, that the State must prove the elements of self-defense are not present, clearly places the burden on the State, as this Court intended.[7] *Addison; Wiggins.* In our opinion, the trial judge erred by not charging under *Wiggins* as requested by defense counsel immediately after the charges were given.

As noted, to warrant reversal, a trial judge's refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant. *Keaton; State v. Hughey,* 339 S.C. 439, 529 S.E.2d 721 (2000). The jury charge is to be read as a whole in considering whether it adequately covers the law. *Hughey.* Failure to give requested jury instructions is not prejudicial error where the instructions given afford the proper test for determining the issues. *Orders Distributing Co., Inc. v. Newsome Carpets & Wallcovering,* 308 S.C. 429, 418 S.E.2d 550 (1992).

Appellant admitted to killing all three victims and relied entirely on self-defense at trial. In another case, the Court of Appeals found the judge's failure to give a requested charge to be prejudicial when the charge related to the "sole issue before the jury." *Ellison v. Parts Distributors, Inc.,* 302 S.C. 299, 395 S.E.2d 740 (Ct.App.1990). The *Ellison* court held prejudice resulted from the judge's failure to give a general charge on circumstantial evidence when the majority of evidence presented on payment, the sole issue in the case, was circumstantial. Because we consider the issue of self-defense versus murder to be the sole issue in this case, we find

---

7. In the concurring opinion, it is argued that the *Wiggins* and *Addison* cases impose an impossible burden on the State and, therefore, should be reversed. As we observed in *Addison,* however, nearly all courts that have considered the state's burden of proof have held that when the defendant presents evidence of self-defense he is entitled to a charge that the state bears the burden of disproving self-defense beyond a reasonable doubt. *See Supra* n. 5 (providing citations of several state court opinions enunciating this rule); 43 A.L.R.3d 221 § 5(b) (Supp. 2001) (listing cases in support of rule that once self-defense is properly raised, the state has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense).

the trial judge's failure to properly instruct the jury on burden of proof to be prejudicial, warranting reversal.[8]

Although the trial judge did charge that the burden was on the State and remains on the State, we do not believe that charge was adequate. Similarly, the fact that defense counsel enunciated the proper burden in his closing argument, telling the jury, "you must find the defendant not guilty unless the State proves to you beyond a reasonable doubt that each of the elements of self-defense do not exist in this case" does not adequately convey the State's burden. Clearly, the judge's instruction carries far more weight with the jury than defense counsel's word in his closing argument. We cannot assume the jury was able to connect the State's general burden to prove Appellant's guilt beyond a reasonable doubt to the trial judge's charge regarding self-defense when the judge failed to mention the reasonable doubt standard at all and only said the defendant did not have to prove self-defense. The trial judge's charge only implicitly placed the burden on the State, and that is not sufficient under *Wiggins* and *Addison*.

Self-defense was the most significant issue for the jury to decide. Appellant admitted to the killings on the stand at trial. His credibility and the relative burdens of proof surrounding self-defense were central to this case. In light of that conclusion, we find the trial judge's error was prejudicial to Appellant and constituted reversible error.

## CONCLUSION

Based on the foregoing reasons, we **REVERSE** and **REMAND** this case for a new trial on each of Appellant's convictions.

MOORE and WALLER, JJ., concur.

PLEICONES, J., concurring in result in a separate opinion in which BURNETT, J., concurs.

---

8. Some courts find proper self-defense charges to be so important that prejudice is presumed if error is identified. " 'A jury instruction misstating the law of self-defense amounts to an error of constitutional magnitude and is presumed prejudicial.' " *State v. Walden,* 131 Wash.2d 469, 932 P.2d 1237, 1239 (1997) (quoting *State v. LeFaber,* 128 Wash.2d 896, 913 P.2d 369 (1996)).

Justice PLEICONES:

I concur with the result reached by the majority. At the time Burkhart was tried, he was entitled to the charge he requested: That the State has the burden of disproving, beyond a reasonable doubt, his self-defense claim. Upon further reflection, however, I am convinced that this charge is confusing and imposes an impossible burden on the State.

In every criminal trial the burden is on the State to prove every element of the crime charged beyond a reasonable doubt. Instructions should focus the jury's attention on this fundamental principle. The charge mandated by *Addison* and *Wiggins*, in essence, requires the State prove, not an element of the offense, but rather a negative.

I agree with the following statement of the law taken from *State v. Davis*, 282 S.C. 45, 46, 317 S.E.2d 452, 453 (1984): If, after considering all the evidence presented including the evidence of self-defense, the jury has a reasonable doubt as to the defendant's guilt, then the jury must find the defendant not guilty. On the other hand, if, after considering all the evidence including the evidence of self-defense, the jury has no reasonable doubt of the defendant's guilt, then it must find the defendant guilty.

In my view, this statement properly informs the jury of the State's burden to prove the defendant's guilt beyond a reasonable doubt.

I therefore concur in the result, and would prospectively overrule *State v. Addison*, 343 S.C. 290, 540 S.E.2d 449 (2000), and *State v. Wiggins*, 330 S.C. 538, 500 S.E.2d 489 (1998).

BURNETT, J., concurs.