THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 The State, Respondent,
 
 
 

v.

 
 
 
 Timothy Darrell Davis, Appellant.
 
 
 

Appeal From Greenville County
C. Victor Pyle, Jr., Circuit Court Judge

Unpublished Opinion No. 2005-UP-152
Submitted February 1, 2005  Filed March 4, 2005

AFFIRMED

 
 
 
 Assistant Appellate Defender Robert M. Dudek, of Columbia, for Appellant.
 Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Senior Assistant Attorney General William Edgar Salter, III, all of Columbia; and Solicitor Robert M. Ariail, of Greenville, for Respondent.
 
 
 

PER CURIAM:  Timothy Darrell Davis appeals his murder conviction, arguing the trial court erred in refusing to clarify its voluntary manslaughter jury instruction, specifically its explanation of sufficient legal provocation.  We affirm.[1]
BACKGROUND

This case arises from the September 2001 stabbing death of Heath Barnette.  Barnette was having a relationship with Davis estranged wife, Lorinda, and was her co-worker at Miracle Hill Ministries.  Davis and Lorinda separated in January or February of 2001.  Davis wanted to reconcile with Lorinda and saw Barnette as an obstacle to that goal.  Beginning in June, Davis began contacting Lorindas family as well as supervisors and clergy at her workplace to discuss the situation.  He asked questions about Barnette and his relationship with Lorinda, asked others to intervene, and asked for a meeting where he could confront Barnette.  He also asked Lorinda to stop seeing Barnette and told her he would not let her have a divorce.  
Additionally, in separate conversations with both Lorinda and her mother, Davis threatened to take the couples two children away and keep them from Lorinda.  Because of these threats, Lorinda moved the children to an undisclosed out-of-state location until she could handle the matter in court.  
The stabbing occurred on September 3, approximately four to six weeks after Lorinda relocated the children.  Eyewitnesses saw two men leave Lorindas apartment.  The first man, bleeding from a wound, was being chased by the other, who was wielding a knife.[2]  Some of the witnesses reported seeing the man with the knife repeatedly stabbing or attempting to stab the injured man.  When Barnette eventually fell to the ground, Davis ran back to his truck.  
In a written statement to police, Davis offered the following version of events.  He entered Lorindas apartment through a window, reportedly to find information about his children.  Inside he encountered Barnette, who was already in the apartment.  Barnette asked Davis to leave and threatened to call the police.  Davis actually encouraged Barnette to call because he did not think Barnette should be in the apartment.  Davis offered to leave if Barnette would go outside with him so other people could see they had both been in Lorindas apartment.  Barnette said one of them was leaving and started making threatening advances, came at Davis to grab him, and then came at Davis swinging.  Davis grabbed a knife from the block on the kitchen counter and told Barnette he did not want to hurt him but did not want to get hurt.  Davis suggested they go outside, but Barnette continued to move toward him.  Davis explained he was wielding the knife to keep Barnette away.  He said, I jabbed the knife outward away from me.  And it stuck him in his right side/abdomen.  I wanted to only cut him at worst, but wound up stabbing him partly due to our momentum while moving toward each other.  After the stabbing, Davis followed Barnette outside and got in his truck, still holding the knife.  He then left, stopping to throw the knife in the river.  In earlier oral statements to police as well as conversations with Lorindas mother and a pastor, Davis told basically the same story except that in those conversations he claimed Barnette lunged at him, running into the knife.  In his conversation with a pastor, Davis admitted that once outside the apartment, he yelled something after [Barnette] to the effect of this will teach you to mess around with another guys wife, before realizing what he had done and fleeing the scene.  
The State asked the court to charge number one, adultery as provocation, adultery, and manslaughter charge.  The trial court agreed, and confirmed it would charge on murder, voluntary manslaughter, self-defense, and accident.  Davis counsel told the trial court, I think the facts -- the four charges that youre going to charge are sufficient.  The trial court instructed the jury as indicated and included the following explanation of voluntary manslaughter:

 Now manslaughter is defined as the taking of a human being -- the life of a human being without malice, but in sudden heat of passion when the heat of passion is caused or brought about by a sufficient legal provocation.  If a person flies into a sudden heat of passion upon a sufficient legal provocation and it results in the death of another, the law says that the act having been done under those circumstances, it would be manslaughter and not murder.
 To illustrate, if I were to go up to one of you and commit an unwarranted attack upon you say by striking you in the face and you acting under the heat of passion aroused by my act of hitting you were to kill me then you would not be guilty of murder but of manslaughter because you killed me in sudden heat of passion caused by my unwarranted attack.
 Now, ladies and gentlemen, I charge you that murder may be reduced to manslaughter if the act was committed in the heat of passion upon sufficient legal provocation.  I just explained that to you.
 And I further charge you that adultery may in some instances serve as a sufficient legal provocation.  However, spousal adultery is not a license to kill.  The killing of a paramour may be reduced from murder to manslaughter where -- only where they are -- where the couple or paramour and the spouse are found engaged in sexual intercourse or some close embrace because this could constitute sufficient legal provocation.
 Therefore the stabbing of a paramour may be reduced from murder to manslaughter where a couple, a paramour and a spouse are found engaged in sexual intercourse or some other close contact because this could constitute a sufficient legal provocation.
 However, ladies and gentlemen, I charge you that where there has been a cooling off time sufficient for a person of ordinary reason and control to rid himself of the overpowering passion caused by the act and the stabbing, the law would say that thats murder and not manslaughter.  

Davis counsel asked the trial court to clarify the jury instruction by explaining a paramour can also be a slapper, but the court found it had adequately covered the definition of sufficient legal provocation.  The jury found Davis guilty of murder and the trial court sentenced him to life in prison.  
DISCUSSION

Davis argues the trial courts instruction was confusing and did not fit the facts of the case, because it failed to sufficiently define legal provocation as it relates to adultery.  Davis suggests the trial court should have explained more clearly that although a person must find his spouse engaged in a close embrace for adultery to constitute sufficient legal provocation, if the spouses paramour attacks the person, that may constitute sufficient legal provocation to reduce the murder to manslaughter.  Read as a whole, the charge did not constitute reversible error.
A trial court must determine the law to be charged based on the evidence at trial.  State v. Crosby, 355 S.C. 47, 51, 584 S.E.2d. 110, 112 (2003).  The trial court should charge only the law applicable to the case, because the purpose of jury instructions is to enlighten the jury.  State v. Lee, 298 S.C. 362, 364, 380 S.E.2d 834, 836 (1989).  Jury instructions that do not fit the facts of the case may confuse the jury.  Id.  On appeal, a jury charge must be reviewed in its entirety and if the charge as a whole is free from error, isolated portions that may be misleading do not constitute reversible error.  State v. Smith, 315 S.C. 547, 554, 446 S.E.2d 411, 415 (1994).  The substance of the law must be charged to the jury, not particular verbiage.  State v. Burkhart, 350 S.C. 252, 261, 565 S.E.2d 298, 303 (2002). 
Voluntary manslaughter is the unlawful killing of a human being in the sudden heat of passion upon sufficient legal provocation.  State v. Cooley, 342 S.C. 63, 67, 536 S.E.2d 666, 668 (2000).  Spousal adultery may serve as sufficient legal provocation, but is not a license to kill.  State v. Gadsden, 314 S.C. 229, 233, 442 S.E.2d, 594, 597 (1994).  For example, the case of a killer lying in wait or searching for the guilty embrace is not one involving sufficient legal provocation.  Id. 
As part of its jury charge, the trial court enumerated the elements of voluntary manslaughter.  It further defined sufficient legal provocation, providing examples of an unwarranted attack as well as provocation resulting from a person finding his spouse in a guilty embrace with a paramour.  The trial court also explained why not all situations involving an adulterous spouse serve to reduce murder to manslaughter.  Even if somewhat confusing, the trial court sufficiently explained the law of voluntary manslaughter.  In fact, the evidence focused heavily on the relationship between Lorinda and Barnette, and Daviss near obsession with it, thereby raising the adulterous spouse issue to the trial court.  The trial court instructed the jury on the law of voluntary manslaughter, including situations involving adultery but also including provocation from an unwarranted attack.  The jury charge was based on the evidence presented and the relevant law.  The charge was without reversible error.
AFFIRMED.
GOOLSBY, HUFF, and STILWELL, JJ., concur.

[1]        We decide this case without oral argument pursuant to Rule 215, SCACR.
[2]        One witness testified he had also seen the same man walk up to Lorindas apartment the day before the stabbing.