533 S.E.2d 572

**The STATE, Respondent,**

**v.**

**Michael Anthony MARTIN, Appellant.**

**No. 25093.**

Supreme Court of South Carolina.

Heard Jan. 5, 2000.
Filed March 27, 2000.
Refiled June 12, 2000.

598

Chief Attorney Daniel T. Stacey, of South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Robert E. Bogan, all of Columbia; and Solicitor Robert M. Ariail, of Greenville, all for respondent.

## ORDER

The opinion heretofore filed in this case, Opinion No. 25093, filed March 27, 2000 is withdrawn and the attached opinion is substituted in its place. The third paragraph of the Law/Analysis section in the initial opinion has been modified. Furthermore, the last three paragraphs of that section have been deleted. Respondent's petition for rehearing is denied.

/s/ Jean H. Toal, C.J.

/s/ Ernest A. Finney, Jr., C.J.

/s/ James E. Moore, J.

/s/ John H. Waller, Jr., J.

/s/ <u>E.C. Burnett, III</u>, J.

TOAL, Justice:

Appellant Michael Martin ("Defendant") and Pierre Wilson ("Co-defendant Wilson") were convicted of murder. Defendant has appealed. We reverse.

## FACTUAL/PROCEDURAL BACKGROUND

Dwayne Cobb ("Victim") was found dead in his apartment on October 16, 1996. Victim's body was found face down in a bucket of water. Drowning was the official cause of death. No time of death was established, but Victim was last seen alive around 2:00 a.m. to 2:15 a.m. The coroner testified that Victim had eaten a fish sandwich within 2 hours prior to his death, but when Victim ate the sandwich is unknown. His body was not discovered until around noon the following day.

Victim was a barber who regularly gave haircuts both at his place of employment and at his apartment. On October 15, 1996, the day before his murder, Defendant and Co-defendant Wilson were both at Victim's apartment between 11:30 a.m. and noon so that Co-defendant Wilson could get a haircut. During the haircut, Victim's friend Shannon Cobb [1] arrived at the apartment. Both defendants left the apartment after the haircut. Victim and Shannon Cobb then left to run errands and take Cobb to work. Cobb testified that Victim discussed with Defendant and Co-defendant Wilson his plans to travel to New York to do some shopping.

During the afternoon, Victim visited his friend Derrick Haygood in Clemson and they played with their pet dogs. Around 6:00 p.m., Victim and Haygood left Clemson and went to Seneca. Later that night, Victim picked up Shannon Cobb from work at 11:30 p.m. The two then went by the Steak and Waffle to get take-out food to eat. Victim took Cobb to her apartment, stayed a few minutes, got a beep on his beeper from Derrick Haygood, used the phone, and left. An unknown amount of time after leaving her apartment, Victim called Shannon Cobb to tell her the Steak and Waffle had given him a fish sandwich instead of the chicken sandwich he ordered. Derrick Haygood and his girlfriend Annitra Robin-

---

1. No family relation to the victim.

son testified that Victim stopped by his apartment in Clemson around 2:00 a.m. the morning of his murder. Victim stayed for a only a brief period of time and left. Victim's home is about a 5 minute drive from Haygood's trailer.

Defendant and Co-defendant Wilson shared an apartment in Pendleton with each other and Defendant's girlfriend Marsha Bhagwandin, an entertainer at a Greenville bar named Nepal's. Bhagwandin testified that around 6:00 p.m. to 7:00 p.m. on the day before the murder Defendant and Co-defendant Wilson took her to work. They kept Bhagwandin's car, a 1996 black Mustang with tinted windows which had an air freshener and parking pass hanging from the rear view mirror. They were to pick her up at 2:00 a.m. when she got off work. When they were late picking Bhagwandin up from work, she left Nepal's and went to a bar called The Hourglass on Laurens Road in Greenville. Defendant and Co-defendant Wilson arrived at The Hourglass around 3:45 a.m. to take Bhagwandin home. When asked why they were late, Bhagwandin testified that Defendant replied "some shit happened" and that Co-defendant Wilson added "somebody may have died tonight." The three went home to Pendleton and stayed there the rest of the night.

Witness Kalita Owens testified that she left a friend's apartment between 2:00 a.m. and 3:00 a.m. the day of the murder. The friend's apartment was only two doors down from Victim's apartment. Owens testified that in front of the apartment building was a dark colored sports car with tinted windows that had something hanging from the rear view mirror. She testified it caught her attention because she had never seen it there before even though she was at her friend's apartment almost daily.

On October 16, 1996, Victim was to take his friend Shannon Cobb to get the tires changed on her car. When Victim didn't show up or answer his pager, Cobb went to his apartment. Around 11:45 a.m., when Victim did not answer his door, Cobb got a maintenance worker to let her into the apartment. Victim's body was discovered on the floor of the apartment face down in a pot of water. The maintenance worker called the police. The cause of Victim's death was drowning, al-

though the pathologist discovered Victim had a black eye and a bloody nose as well.

Around 11:00 a.m. on the morning of the murder, the manager of T–Bones Restaurant in Greenville noticed several bags of garbage in the store's dumpster. T–Bones is located on the same Laurens Road in Greenville as The Hourglass bar where Defendant and Co-defendant Wilson picked up Bhagwandin the night before. The manager found in the trash several items including a cell phone, jewelry, and a photograph of Victim's apartment that Victim's uncle identified as personal items belonging to Victim. Also in the trash were dark colored clothes, a pair of female underwear, and a pair of large sneakers. Latex gloves where also found in the trash that the uncle did not identify as Victim's. Bhagwandin testified that she had bought similar latex gloves to use while cleaning her dog and apartment before moving in with Defendant and Co-defendant Wilson.

According to the testimony of Sylvia Jimenez and her son Jesse Jimenez, two black men named Michael and Pierre stopped by Sylvia's daughter's apartment in Seneca around 12:30 a.m. and stayed for about 15 minutes the morning of the murder. Jesse testified that the two were wearing black clothes and driving a black mustang with tinted windows. The clothing color is significant because the articles of clothing found in the dumpster behind T–Bones along with the Victim's belongings were black clothes.

The State entered Co-defendant Wilson's statement to the police into the record. Co-defendant Wilson stated:

Dwayne was my barber, he cut my hair Tuesday morning at about nine or ten a.m. He was cutting another guy's hair when I got there so I had to wait. I was there about an hour, then I left, I went back home to Pendleton, my roommate was there with his girlfriend, we took her to work around 6:30 p.m., then we went to the movies, we saw Last Man Standing, the movie started at 9:55 p.m. After the movie we rode around and then we went to pick up Marcia [Bhagwandin] at Nepal's around two a.m. After that we went to the Huddle House to eat, after eating we went back home to Pendleton.

After entering the statement, the State rested. Both defendants made motions for a directed verdict that the trial court denied. Neither defendant put up a defense. The jury returned with a guilty verdict for both Defendant and Co-defendant Wilson. Defendant has appealed and the issues before the Court are:

I.   Did the trial court err by not granting a directed verdict at the conclusion of the State's case based on a failure to produce substantial evidence of Defendant's guilt?

II.  Did the trial court err by denying a motion for a mistrial after the solicitor emphasized Defendant's lack of remorse and failure to present a defense?

III. Did the trial court err by not granting a directed verdict after the solicitor stated in his closing that "we will probably never know which one of these defendants actually did the killing."?

## LAW/ANALYSIS

### I.   Failure to Grant a Directed Verdict Based on a Lack of Evidence

■ Defendant argues the trial court erred by not directing a verdict because the State failed to place him at the scene of the crime or show his participation in the killing of the Victim. We agree.

■ The trial court has a duty to submit the case to the jury where the evidence is circumstantial, if there is substantial circumstantial evidence which reasonably tends to prove the guilt of the accused or from which his guilt may be fairly and logically deduced. *State v. Williams*, 321 S.C. 327, 468 S.E.2d 626 (1996). The trial judge should grant a directed verdict motion when the evidence merely raises a suspicion that the accused is guilty. *State v. Irvin*, 270 S.C. 539, 243 S.E.2d 195 (1978). In reviewing the appeal of a refusal to grant a directed verdict of not guilty, this Court must look at the evidence in the light most favorable to the State. *Williams*, 321 S.C. at 332–33, 468 S.E.2d at 629.

In this case, the State failed to meet the "any substantial evidence" standard. Most significantly, the State's evidence failed to place either defendant inside the apartment. The

Solicitor himself summed up the State's failure of proof by confessing to the trial judge "we don't know which person actually held [Victim's] head in that pan of water" and "Your Honor, the whole point is we don't know if they acted in concert." Put another way, unlike the usual accomplice liability case or aiding and abetting situation, here the State had no proof that either defendant held Victim's head under water and the State had no proof that the defendants were working together to bring about the Victim's death.

Taken in a light most favorable to its position, the State's has shown that a car resembling the one in possession of the Defendant was parked at the Victim's apartment complex the night the murder was committed. There is no evidence (such as a license tag number) that the black car was actually Bhagwandin's black mustang. The State also presented no evidence that both defendants arrived at the apartment complex in that car or that either defendant entered Victim's apartment. Furthermore, there is no evidence establishing the death occurred during the time the black car was in front of the building.

This case is similar to *State v. Schrock*, 283 S.C. 129, 322 S.E.2d 450 (1984), in which this Court reversed the denial of a directed verdict in a murder conviction. In *Schrock*, the State presented evidence the defendant was in the area of the murders and that footprints at the scene of the crime were similar to footprints found in the area in which Schrock admitted he had been walking. In this case, the black car seen at the apartment is not identified as Bhagwandin's car. Like the footprints in *Schrock*, the possibility that it was the same car, without any other evidence placing the defendants at the scene, is not enough evidence to place Defendant inside Victim's apartment.

## Conclusion

We **REVERSE** the trial court's denial of a directed verdict. Accordingly, we need not address the other issues on appeal.

FINNEY, C.J., MOORE, WALLER, and BURNETT, JJ., concur.