534 S.E.2d 716

**The STATE, Respondent,**

v.

**James Michael FRANKLIN, Appellant.**

No. 3209.

Court of Appeals of South Carolina.

Submitted Feb. 8, 2000.

Decided July 3, 2000.

Chief Attorney Daniel T. Stacey, of S.C. Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon and Chief Deputy Attorney General John W. McIntosh, both of Columbia; and Solicitor Donald V. Myers, of Lexington, for respondent.

HOWARD, Judge:

James Michael Franklin was indicted for burglary, second degree, grand larceny, and criminal conspiracy. Franklin was convicted by a jury on the criminal conspiracy charge, and

acquitted of the remaining charges. Franklin appeals the denial of his motion for a new trial, made on the ground of internal jury misconduct, and the refusal of the trial court to hold an evidentiary hearing on the issue of jury misconduct. We affirm.

## FACTS/PROCEDURAL BACKGROUND

Franklin was tried on August 11 and 12, 1997. Shortly after the court submitted the case to the jury, the jury asked to receive a written charge of the elements of each crime. Instead, the court orally instructed the jury again on the elements. The jury sent the court another note, several hours later, asking whether Franklin had pled guilty to conspiracy. The court replied to this question in the negative, and the jury resumed deliberations. Less than an hour later, the court received another note from the jury, which asked what they should do if they could not reach a unanimous verdict. In response, the court gave the jury an *Allen*[1] charge. Approximately thirty minutes later, the jury returned a verdict of guilty on the conspiracy charge and not guilty on the burglary and grand larceny indictments.

After the verdict was received, the trial court entertained questions from the jury. Juror Simmons remained in the jury room after other jurors departed, indicating she would like to speak with the judge and attorneys alone. In that meeting, she stated she had voted guilty because she felt coerced.

The next day Franklin filed a motion for a new trial on the basis of after-discovered evidence.[2] Franklin later submitted a memorandum alleging Simmons voted guilty under duress from her fellow jurors, who coerced her with gender-based

---

1. *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

2. At the trial level, Franklin asserted that a juror viewed Franklin and his wife in conversation in the halls of the courthouse during a "smoke break." The juror allegedly returned to the jury room and informed other jurors that Franklin and his wife were on good terms with each other. Because Franklin attempted to portray his wife as a reluctant or "hostile" witness, thereby hoping to give her testimony more credibility, Franklin argued that this impromptu viewing and discussion by the jury constituted an improper, outside influence improperly affecting the verdict. However, Franklin does not raise this argument on appeal.

comments, derogatory comments, and physical threats. An affidavit by juror Simmons was submitted to the court in support of the motion. Following arguments of counsel, the court ruled that the affidavit did not give rise to a prima facie showing of gender or other bias, and that there was no evidence of jury misconduct implicating concerns of fundamental fairness. The court ruled that no further inquiry was required. The motion for new trial was denied accordingly.

## LAW/ANALYSIS

Franklin argues on appeal that juror Simmons's affidavit gives rise to at least a factual issue concerning undue coercion and gender bias, raising a question of fundamental fairness. Franklin asserts that the failure of the court to make further inquiry by embarking upon a fact-finding process was error. Franklin also argues that the allegations in the affidavit, alone, are sufficient evidence of gender bias and coercion to impeach the verdict, requiring that it be overturned and a new trial granted. We disagree with both of these contentions.

After it became clear juror Simmons was the only juror voting to acquit Franklin on all charges, she became the unwilling center of attention. Her affidavit contained four allegations concerning subsequent events. In her first allegation, which Franklin characterizes as evidence of gender bias, Simmons stated:

At this point, the focus of the panel began to be directed solely at me. I was called "stupid," "a dumb bitch," "a child," and other derogatory names by at least six of the jurors. Of these six, five were men. I was being given dirty looks, and the jurors were rolling their eyes at me. I was being blamed for the other jurors' missing work, family, children, "Days of Our Lives," and that I was wasting the taxpayers' money. The name-calling and yelling lasted for at least four hours.

In her second allegation, Simmons stated:

At one point, one of the jurors asked how the panel could get the alternate to participate. Another juror replied that "someone would have to die." Then I said that it "would have to be me" in order for the vote to change and everyone laughed and agreed. Their laughs were not in a friendly,

joking manner, but were instead more like they were laughing at me.

In her third allegation, Simmons complained that in an attempt to change her verdict, some members of the jury stood next to her yelling, while others paced the room screaming at her.

Simmons's fourth allegation concerns an event occurring after the verdict. After speaking with the judge and attorneys, Simmons asked for an escort to her car. When she walked out with a bailiff, she saw three jurors, one female and two male, waiting for her. She attributes an evil motive to the group, although there is no allegation that anything was said to her or any movement made toward her.

We begin our analysis of these allegations by first recognizing that generally, juror testimony is inadmissible to impeach a jury verdict. *State v. Hunter*, 320 S.C. 85, 463 S.E.2d 314 (1995). However, juror testimony or affidavits are admissible to prove an allegation of extraneous information or influence. *Id.* (juror testimony may normally be used when an extraneous influence is alleged); Rule 606(b), SCRE (testimony or affidavit of juror is admissible to demonstrate that outside prejudicial information was brought to jury's attention or that outside influence was placed on any juror). Until recently, the prohibition against juror testimony regarding allegations of internal jury misconduct remained intact. *See State v. Thomas*, 268 S.C. 343, 234 S.E.2d 16 (1977); *Barsh v. Chrysler Corp.*, 262 S.C. 129, 203 S.E.2d 107 (1974).

In *State v. Hunter*, 320 S.C. 85, 463 S.E.2d 314 (1995), our supreme court carved an exception to this rule, holding that juror testimony is competent in cases involving internal misconduct where necessary to ensure fundamental fairness. In that case, the allegations concerned the influence of racial prejudice on a verdict. The court held, "[i]f a juror claims prejudice played a role in determining the guilt or innocence of a defendant, investigation into the matter is necessary. To hold otherwise would violate 'the plainest principles of justice.'" *Hunter*, 320 S.C. at 88, 463 S.E.2d at 316 (citing *McDonald v. Pless*, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915)).

Viewing the allegations of juror Simmons, we find no error in the trial judge's determination that Simmons's allegations do not implicate due process concerns.

■ First, we disagree with Franklin's characterization of the derogatory names as gender bias. A fair reading of Simmons's affidavit shows that she was not coerced through the use of gender-based bias or discrimination. Although Simmons was called "a dumb bitch," jurors also called her other derogatory names which were not gender specific. Further, her affidavit indicates that she was called this offensive name by only one juror on one occasion.

■ Moreover, the use of a gender-specific term in a derogatory comment does not necessarily indicate that the comment is directed at the person's gender. *See Johnson v. Waters,* 970 F.Supp. 991 (M.D.Ala.1997) (holding that use of a derogatory term, standing alone, is not necessarily a direct showing of discrimination, but rather must be considered in the context in which it was used). *See also Kriss v. Sprint Communications Co., Ltd. Partnership,* 58 F.3d 1276, 1281 (8th Cir.1995) (concluding that use of the term "bitch" did not indicate "a general misogynist attitude" as it was directed at only one woman and thus was not "particularly probative of gender discrimination"). Viewing the use of the gender specific term within context in this case, we find no evidence of gender bias.

■ We also find no error in the trial judge's conclusion that the remaining allegations do not indicate internal misconduct sufficient to raise a due process concern. Simmons's version of the events surrounding the comment that "in order for the alternate to participate in deliberations another juror would have to die," does not imply any threat of harm to Simmons. Nor does the remaining colloquy on the subject.

■ Simmons's last complaint of constant yelling by some male jurors standing next to her, and "screaming" of other jurors who paced the room, is also insufficient to raise concerns of fundamental fairness. In *Hunter,* a juror who wished to vote not guilty claimed several jurors gathered around another, touched her shoulders, and stated "You know he's guilty, you know he's guilty." *Hunter,* 320 S.C. at 87, 463 S.E.2d at 315–16. On appeal, the court found the claim

insufficient to show she was coerced into changing her vote. Although we do not doubt that staying in a juror room with others who are constantly vocalizing an opinion different from one's own must be challenging, we find even less evidence of coercion here than in the *Hunter* case. Other jurors actually touched the juror in *Hunter,* whereas here they did not.

■ Finally, Simmons's conclusion that three jurors standing near her car in the parking lot when she left the courthouse somehow indicated an intention to harm her is unfounded speculation.

In conclusion, we emphasize that the exception to the general rule against review of internal jury deliberations carved out in *Hunter* is a narrow one, limited by our supreme court to those few situations which implicate due process raising a question of fundamental fairness. A jury verdict which is based upon racial discrimination fits within this definition. But the integrity of the jury system is jeopardized any time a court finds it necessary to intrude into the internal deliberation. process. Such an inquiry should not be lightly made.

The nature of the jury process can be intimidating to those who dislike confrontation and debate. It is all the more difficult in a criminal case, where jurors are most likely to feel the weight of their decision. In the setting of a confined deliberation room, it is understandable that some jurors become very sensitive to the outward manifestations of anger or animosity exhibited by other jurors who do not share the same point of view. Needless to say, not every juror is well versed in the art of gentle persuasion.

It appears that Juror Simmons became very sensitive to the pressure applied by other jurors. The degree of sensitivity is highlighted by her statement that the *Allen* charge led her to believe even the judge was mad at her. This reaction is unfortunate, but it is not of such a nature as to implicate due process. We find no error in the trial court's conclusion. Consequently, no further inquiry was necessary, and a new trial was not warranted.

For the foregoing reasons, the conviction is

**AFFIRMED.**

GOOLSBY and CONNOR, JJ., concur.