610 S.E.2d 859

**The STATE, Respondent,**

v.

**Antwan Lamont ZEIGLER, Appellant.**

**No. 3967.**

Court of Appeals of South Carolina.

Heard March 8, 2005.
Decided March 21, 2005.
Rehearing Denied August 26, 2005.

96

Assistant Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General Melody J. Brown, all of Columbia; and Solicitor Robert D. Robbins, of Summerville, for Respondent.

ANDERSON, J.

Antwan Lamont Zeigler appeals from his conviction for murder. He argues the trial court erred in (1) denying his

motion for a directed verdict; (2) giving an inadequate jury charge on mere presence; and (3) failing to take sworn juror testimony and denying Antwan's motion for a new trial based on allegations of juror misconduct. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Gregory McDonald, also know as Boobie, was murdered on January 19, 2001, near a trailer on Land Fill Road in Orangeburg County. On the night of the murder, McDonald traveled to the trailer with Larry Zeigler, George Zeigler, and Barry Collier. Troy Zeigler, his cousin Antwan Zeigler, James Hallman, Germaine Eric Hallman, and Kenneth Kirk Thomas were already inside the trailer when McDonald arrived.

According to Collier, when he entered the trailer, Antwan looked at him as if Collier had "done something bad." Because Antwan and Troy were whispering to each other and staring at him, Collier began to feel uncomfortable and decided to exit the trailer. Antwan and Troy attempted to prevent Collier from leaving. Antwan and Troy followed Collier outside. Collier stated he "felt unsafe." At that point, Antwan and Troy threw "one or two" beer bottles at Collier. Collier jumped in his vehicle and drove away.

Kenneth Kirk Thomas testified Antwan entered the trailer and "told Boobie he was the police," meaning McDonald was working for the police as a confidential informant. Troy, Antwan, and the Hallmans surrounded McDonald. George Zeigler, Troy and Antwan's cousin, declared Antwan "told [McDonald] he had to leave" and that Antwan and McDonald "got into an argument." Thomas observed Antwan throw a beer bottle at McDonald. Larry Zeigler, Troy's brother and Antwan's cousin, saw Troy and Eric Hallman hit McDonald. George testified he "thought that [Antwan] ... thr[e]w a punch." When McDonald attempted to leave, Troy and the Hallmans threw bottles at him. McDonald ran out of the trailer onto Land Fill Road. Troy, Antwan, and the Hallmans followed McDonald.

Approximately ten to fifteen minutes later, Antwan, Troy and the Hallmans had not returned. Thomas, Larry Zeigler, and George Zeigler decided to leave. As the men were leaving the trailer, Thomas saw Antwan and Troy walking

back up the dirt road toward the trailer from about twenty feet away. When Thomas, Larry Zeigler, and George Zeigler reached "the end of the road," they noticed McDonald's body lying facedown on the side of the road. McDonald was not moving. George asked Thomas to stop the car so they could help McDonald. Thomas refused to help and instructed George: "Don't get yourself in nothing."

Thomas, Larry Zeigler, and George Zeigler drove to the Zeiglers' grandmother's house. Antwan and Troy arrived at the home after the others. Thomas testified Troy said: "I kicked that nigger to death." Antwan responded: "He deserved it." Thomas noted Troy was walking with a limp and that he thought Troy's toe was swollen.

The police, acting on a tip, located McDonald's body in a ditch near the trailer on Land Fill Road. Dr. Janice Ross, a forensic pathologist, performed the autopsy on McDonald. McDonald had suffered injuries to his eyeballs and both sides of his head, had bruising under the scalp, and bleeding around the brain. Dr. Ross opined McDonald died from "bleeding around the brain ... due to a beating." McDonald died "within minutes" from this severe beating. Dr. Ross testified the type of injuries sustained by McDonald allowed her to discount an assertion that the injuries were caused by McDonald falling down or being struck by a car. Dr. Ross concluded McDonald's injuries were a result of "blows delivered by someone else." She stated the injuries were consistent with "what [she's] seen caused by fists." The Solicitor asked Dr. Ross: "Would [McDonald's injuries] also have been consistent with him being kicked?" Dr. Ross answered: "It could."

Antwan and Troy were indicted for the murder of McDonald. The case proceeded to trial. At the close of the State's evidence, counsel for Antwan moved for a directed verdict, claiming there was "absolutely no evidence to connect either of these defendants with the murder of Mr. McDonald." Troy's attorney adopted Antwan's lawyer's argument. The State argued the evidence showed "Antwan Zeigler started an altercation in the trailer, hit the deceased, threw a bottle at him, and chased him out of the trailer," along with Troy Zeigler. The trial court denied the motion, finding "the fact

that they left right after the victim did, came back without him, very shortly thereafter the body was seen, and we've got ... statements that ... one of them kicked him and the other one said he deserved it, would be strong enough circumstantial evidence to make it a jury case."

The jury found both Troy and Antwan guilty of murder. They were each sentenced to forty-five years.

## ISSUES

I. Did the trial court err in denying Antwan's motion for a directed verdict?

II. Did the trial court give a proper and correct instruction on mere presence?

III. Did the trial court err in refusing to take sworn juror testimony and denying Antwan's motion for a new trial based on allegations of juror misconduct?

## LAW/ANALYSIS

## I. DIRECTED VERDICT

Antwan contends the trial court erred in denying his motion for a directed verdict because "there was not any direct evidence or any substantial circumstantial evidence that [Antwan] killed [McDonald]." Antwan maintains his mere presence at the scene was insufficient to prove his guilt in the murder. He asserts the "evidence against [him] only raised a suspicion of his guilt, and he was convicted based on that suspicion." We disagree.

### A. Standard of Review

On appeal from the denial of a directed verdict in a criminal case, an appellate court must view the evidence in the light most favorable to the State. *State v. Curtis,* 356 S.C. 622, 591 S.E.2d 600 (2004); *State v. Crawford,* 362 S.C. 627, 608 S.E.2d 886 (App.2005); *State v. Al–Amin,* 353 S.C. 405, 578 S.E.2d 32 (Ct.App.2003). When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight. *Sellers v. State,* 362 S.C. 182, 607 S.E.2d 82 (2005); *State v. Cherry,* 361 S.C.

588, 606 S.E.2d 475 (2004); *State v. Wilds,* 355 S.C. 269, 584 S.E.2d 138 (Ct.App.2003).

If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, an appellate court must find the case was properly submitted to the jury. *Cherry,* 361 S.C. at 593–94, 606 S.E.2d at 478; *State v. Harris,* 351 S.C. 643, 572 S.E.2d 267 (2002); *State v. Follin,* 352 S.C. 235, 573 S.E.2d 812 (Ct.App.2002); *see also State v. Horton,* 359 S.C. 555, 598 S.E.2d 279 (Ct.App.2004) (noting judge should deny motion for directed verdict if there is any direct or substantial circumstantial evidence which reasonably tends to prove accused's guilt, or from which his guilt may be fairly and logically deduced). When a motion for a directed verdict is made in a criminal case in which the State relies exclusively on circumstantial evidence, the trial judge is required to submit the case to the jury if there is any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced. *State v. Walker,* 349 S.C. 49, 562 S.E.2d 313 (2002); *State v. Buckmon,* 347 S.C. 316, 555 S.E.2d 402 (2001); *Al–Amin,* 353 S.C. at 411, 578 S.E.2d at 35; *see also State v. Martin,* 340 S.C. 597, 533 S.E.2d 572 (2000) (stating trial court has duty to submit case to jury where evidence is circumstantial, if there is substantial circumstantial evidence which reasonably tends to prove guilt of accused or from which his guilt may be fairly and logically deduced). On the other hand, a defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged. *Cherry,* 361 S.C. at 593, 606 S.E.2d at 478; *Horton,* 359 S.C. at 563, 598 S.E.2d at 284; *State v. Padgett,* 354 S.C. 268, 580 S.E.2d 159 (Ct.App.2003).

The trial judge should grant a directed verdict when the evidence merely raises a suspicion that the accused is guilty. *State v. Arnold,* 361 S.C. 386, 605 S.E.2d 529 (2004); *State v. Schrock,* 283 S.C. 129, 322 S.E.2d 450 (1984). "Suspicion" implies a belief or opinion as to guilt based upon facts or circumstances which do not amount to proof. *Cherry,* 361 S.C. at 594, 606 S.E.2d at 478; *State v. Lollis,* 343 S.C. 580, 541 S.E.2d 254 (2001). However, a trial judge is not required to find that the evidence infers guilt to the exclusion of any other

reasonable hypothesis. *Cherry*, 361 S.C. at 594, 606 S.E.2d at 478; *State v. Ballenger*, 322 S.C. 196, 470 S.E.2d 851 (1996).

██ The appellate court may reverse the trial judge's denial of a motion for a directed verdict only if there is no evidence to support the judge's ruling. *State v. Gaster*, 349 S.C. 545, 564 S.E.2d 87 (2002).

## B. Definitional Analysis of Murder

██ South Carolina law defines murder as "the killing of any person with malice aforethought, either express or implied." S.C.Code Ann. § 16–3–10 (2003); *Sellers v. State*, 362 S.C. 182, 607 S.E.2d 82 (2005). Malice is the wrongful intent to injure another and indicates a wicked or depraved spirit intent on doing wrong. *State v. Kelsey*, 331 S.C. 50, 502 S.E.2d 63 (1998).

 Any person who is present at a homicide, aiding and abetting, is guilty of the homicide as a principal, even though another does the killing. *State v. Crowe*, 258 S.C. 258, 188 S.E.2d 379 (1972); *State v. Griggs*, 184 S.C. 304, 192 S.E. 360 (1937). Mere presence at the scene of a crime is insufficient to convict one as a principal on the theory of aiding and abetting. *State v. Johnson*, 291 S.C. 127, 352 S.E.2d 480 (1987); *State v. Condrey*, 349 S.C. 184, 562 S.E.2d 320 (Ct. App.2002).

Antwan relies on *State v. Martin*, 340 S.C. 597, 533 S.E.2d 572 (2000), arguing "[t]here is less evidence against the two appellants in this case than there was against the defendant" in *Martin*. This reliance is misplaced as *Martin* is inapposite.

In *Martin*, the supreme court found the trial court erred in failing to grant the defendant's motion for directed verdict because there was a total lack of evidence, either direct or circumstantial, linking the defendants to the murder. In that case, the State was unable to establish a time of death of the victim, lacked any witnesses identifying the defendants at the scene of the crime at the time of the murder, and had no evidence of the defendants being in the victim's apartment any time after the victim was last seen. The *Martin* court inculcated:

In this case, the State failed to meet the "any substantial evidence" standard. Most significantly, the State's evidence failed to place either defendant inside the apartment. The Solicitor himself summed up the State's failure of proof by confessing to the trial judge "we don't know which person actually held [Victim's] head in that pan of water" and "Your Honor, the whole point is we don't know if they acted in concert." Put another way, unlike the usual accomplice liability case or aiding and abetting situation, here the State had no proof that either defendant held Victim's head under water and the State had no proof that the defendants were working together to bring about the Victim's death.

Taken in a light most favorable to its position, the State has shown that a car resembling the one in possession of the Defendant was parked at the Victim's apartment complex the night the murder was committed. There is no evidence (such as a license tag number) that the black car was actually [defendant's girlfriend's] black mustang. The State also presented no evidence that both defendants arrived at the apartment complex in that car or that either defendant entered Victim's apartment. Furthermore, there is no evidence establishing the death occurred during the time the black car was in front of the building.

This case is similar to *State v. Schrock*, 283 S.C. 129, 322 S.E.2d 450 (1984), in which this Court reversed the denial of a directed verdict in a murder conviction. In *Schrock*, the State presented evidence the defendant was in the area of the murders and that footprints at the scene of the crime were similar to footprints found in the area in which Schrock admitted he had been walking. In this case, the black car seen at the apartment is not identified as [the defendant's girlfriend's] car. Like the footprints in *Schrock*, the possibility that it was the same car, without any other evidence placing the defendants at the scene, is not enough evidence to place Defendant inside Victim's apartment.

*Martin,* 340 S.C. at 602–03, 533 S.E.2d at 574–75. In contrariety to the present case, there was virtually no evidence linking the defendants in *Martin* to the drowning death of the victim.

## C. Evidentiary Record

In the instant case, the record provides substantial circumstantial evidence reasonably tending to prove Antwan's guilt. Viewed in the light most favorable to the State, there was substantial circumstantial evidence to submit the murder charge to the jury. Antwan accused McDonald of working for the police and told him he had to leave the trailer. Antwan and McDonald then "got into an argument." Thomas saw Antwan throw a beer bottle at McDonald. Larry Zeigler observed Troy and Eric Hallman hit McDonald. George Zeigler stated he "thought that [Antwan] ... thr[e]w a punch." When McDonald attempted to leave, Troy and the Hallmans threw bottles at him. McDonald ran out of the trailer onto Land Fill Road. Troy, Antwan, and the Hallmans pursued McDonald. Approximately ten to fifteen minutes later, when Thomas, Larry Zeigler, and George Zeigler decided to leave the trailer, Antwan, Troy and the Hallmans had not returned. As the three men left the trailer, Thomas noticed Antwan and Troy walking back up the dirt road toward the trailer from about twenty feet away. At "the end of the road," Thomas, Larry Zeigler, and George Zeigler observed McDonald's body lying motionless facedown on the side of the road. Importantly, there was a specific window of about ten to fifteen minutes from the time (1) McDonald ran out of the trailer; (2) he was chased by Troy and Antwan; (3) he suffered a severe beating; (4) Thomas saw Antwan and Troy walking back up the dirt road toward the trailer; and (5) McDonald was seen lying motionless on the side of the road. The pathologist confirmed McDonald died "within minutes" from bleeding around the brain due to a beating. Later that night, at the Zeiglers' grandmother's house, Troy informed Thomas: "I kicked that nigger to death." Antwan then stated: "He deserved it." Thomas noted Troy was limping and that he thought Troy had a swollen toe.

The trial judge did not err in denying Antwan's motion for a directed verdict on the charge of murder.

## II. JURY CHARGE

Antwan asserts the trial court "erred by refusing to give a proper mere presence charge." We disagree.

At the conclusion of the judge's charge to the jury, Antwan's attorney complained: "Your Honor, you mentioned something about being merely present in with the hand of one is the hand of all theory but I didn't hear the mere presence theory that I was expecting to hear, as far as a charge, and we would ask that you charge the mere presence." The judge denied the request and found the charge he had given was sufficient.

Generally, the trial judge is required to charge only the current and correct law of South Carolina. *Sheppard v. State,* 357 S.C. 646, 594 S.E.2d 462 (2004); *State v. Burkhart,* 350 S.C. 252, 565 S.E.2d 298 (2002); *see also State v. Buckner,* 341 S.C. 241, 534 S.E.2d 15 (Ct.App.2000) (holding jury charge is proper if, as a whole, it is free from error and reflects current and correct law of South Carolina). In reviewing jury charges for error, we must consider the court's jury charge as a whole in light of the evidence and issues presented at trial. *State v. Adkins,* 353 S.C. 312, 577 S.E.2d 460 (Ct.App.2003). If, as a whole, the charges are reasonably free from error, isolated portions which might be misleading do not constitute reversible error. *State v. Sims,* 304 S.C. 409, 405 S.E.2d 377 (1991); *State v. Jackson,* 297 S.C. 523, 377 S.E.2d 570 (1989).

A jury charge is correct if, when the charge is read as a whole, it contains the correct definition and adequately covers the law. *In re McCracken,* 346 S.C. 87, 551 S.E.2d 235 (2001); *State v. Johnson,* 315 S.C. 485, 445 S.E.2d 637 (1994); *see also State v. Burton,* 302 S.C. 494, 397 S.E.2d 90 (1990) (charge is sufficient if, when considered as a whole, it covers law applicable to case). The substance of the law is what must be charged to the jury, not any particular verbiage. *Burkhart,* 350 S.C. at 261, 565 S.E.2d at 303; *State v. Smith,* 315. S.C. 547, 446 S.E.2d 411 (1994); *Adkins,* 353 S.C. at 318–19, 577 S.E.2d at 464.

A jury charge which is substantially correct and covers the law does not require reversal. *State v. Foust,* 325 S.C. 12, 479 S.E.2d 50 (1996); *State v. Hoffman,* 312 S.C. 386, 440 S.E.2d 869 (1994). To warrant reversal, a trial judge's refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant. *State v. Hughey,* 339

S.C. 439, 529 S.E.2d 721 (2000); *Adkins,* 353 S.C. at 319, 577 S.E.2d at 464.

■■■ The mere presence charge was sufficient. To be guilty as an aider or abettor, the participant must have knowledge of the principal's criminal conduct. *State v. Leonard,* 292 S.C. 133, 355 S.E.2d 270 (1987). Mere presence at the scene is not sufficient to establish guilt as an aider or abettor. *Id.* at 137, 355 S.E.2d at 272; *State v. Johnson,* 291 S.C. 127, 352 S.E.2d 480 (1987); *State v. Green,* 261 S.C. 366, 200 S.E.2d 74 (1973).

The trial court gave the following jury instruction in regard to mere presence:

The mere knowledge that another person is going to commit a crime, even if the defendant is present when the crime is committed is not sufficient to convict the defendant as a principal. Guilt is shown by active or constructive presence at the scene, and the State must prove beyond a reasonable doubt by competent evidence the theory of the hand of one is the hand of all. A principal in a crime is one who either actually commits the crime or who is present, aiding, abetting or assisting in the commission of the crime. When a person does an act in the presence of and with the assistance of another, the act is done by both. Where two or more acting with a common plan or intent [are] present at the commission of a crime, it does not matter who actually commits the crime, all are guilty. The hand of one is the hand of all. Present means to be sufficiently near to aid and abet and assist in the commission of the crime. Intent is also a necessary element, for there must have been a common design or intent to commit the crime, and the crime must have been committed pursuant to that plan, with the person aiding and abetting by some overt act.

The charge in the case *sub judice* adequately apprises the jury as to the law regarding mere presence. The charge contains the correct definition for mere presence and adequately covers the law.

Additionally, Antwan claims the charge was not sufficient because it did not track the jury instruction given in *State v. Kelsey,* 331 S.C. 50, 502 S.E.2d 63 (1998). This argument is without merit. The substance of the law is what must be

charged to the jury, not any particular verbiage. *See Burkhart,* 350 S.C. at 261, 565 S.E.2d at 303. Because the trial judge adequately charged the jury as to the law of mere presence, we need not look to the particular verbiage used in giving the instruction.

## III. JUROR MISCONDUCT

Antwan alleges the trial court erred in finding he failed to present any evidence regarding juror misconduct that would warrant sworn juror testimony or a new trial. We disagree.

On appeal, the denial of a new trial motion will be disturbed only upon a showing of an abuse of discretion. *State v. Kelly,* 331 S.C. 132, 502 S.E.2d 99 (1998); *State v. Smith,* 316 S.C. 53, 447 S.E.2d 175 (1993). A denial of a new trial based on alleged jury misconduct is reviewed for an abuse of discretion. *State v. Covington,* 343 S.C. 157, 539 S.E.2d 67 (Ct.App.2000). The trial court has broad discretion in assessing allegations of juror misconduct. *Kelly,* 331 S.C. at 141, 502 S.E.2d at 104. Unless the misconduct affects the jury's impartiality, it is not such misconduct as will affect the verdict. *State v. Grovenstein,* 335 S.C. 347, 517 S.E.2d 216 (1999); *Kelly,* 331 S.C. at 141, 502 S.E.2d at 104.

The general test for evaluating alleged juror misconduct is whether there in fact was misconduct and, if so, whether any harm resulted to the defendant as a consequence. *State v. Smith,* 338 S.C. 66, 525 S.E.2d 263 (Ct.App.1999). Where a defendant seeks a new trial on the basis of juror misconduct, he is required to prove both the alleged misconduct and the resulting prejudice. *State v. Galbreath,* 359 S.C. 398, 597 S.E.2d 845 (Ct.App.2004); *see also State v. Aldret,* 333 S.C. 307, 509 S.E.2d 811 (1999) (a defendant must demonstrate prejudice from jury misconduct in order to be entitled to a new trial). Misconduct of a juror is a fact to be determined by the trial judge from the circumstances of each case. *Smith,* 338 S.C. at 71, 525 S.E.2d at 266.

In a criminal prosecution, the conduct of the jurors should be free from all extraneous or improper influences. *Kelly,* 331 S.C. at 141, 502 S.E.2d at 104; *see also State v. Salters,* 273

S.C. 501, 257 S.E.2d 502 (1979) (finding a defendant in a criminal prosecution is constitutionally guaranteed a fair trial by an impartial jury and, in order to fully safeguard this basic protection, it is required that the jury render its verdict free from outside influences).

Initially, the trial judge must make a factual determination as to whether juror misconduct has occurred. *See Smith,* 338 S.C. at 71, 525 S.E.2d at 266; *see also Aldret,* 333 S.C. at 315, 509 S.E.2d at 815 (holding where affidavits supporting juror misconduct are credible, the trial court must conduct an evidentiary hearing to determine if misconduct occurred). "Only if the trial court finds a juror is guilty of misconduct must the judge determine whether the misconduct affected the verdict, warranting a new trial." *Covington,* 343 S.C. at 164, 539 S.E.2d at 70.

As a general rule, juror testimony is inadmissible to impeach a jury verdict. *State v. Hunter,* 320 S.C. 85, 463 S.E.2d 314 (1995). Normally, courts should not intrude into the privacy of the jury room to scrutinize how jurors reached their verdict. *Id.* Traditionally, a juror's testimony was not admissible to prove either his own misconduct or the misconduct of other jurors. *Galbreath,* 359 S.C. at 405, 597 S.E.2d at 848. However, Rule 606(b), SCRE, altered this common law rule, and now, juror testimony regarding external prejudicial information or improper outside influence is allowed. Rule 606(b) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Thus, juror testimony or affidavits are admissible to prove an allegation of extraneous information or influence. *See State v. Franklin,* 341 S.C. 555, 534 S.E.2d 716 (Ct.App.2000); *see also Aldret,* 333 S.C. at 310, 509 S.E.2d at 812 (juror testimony or affidavits are generally admissible in the case of an extraneous influence); *Hunter,* 320 S.C. at 88, 463 S.E.2d at 316 (juror testimony may normally be used when an extraneous influence is alleged). External influence on a jury involves situations where jurors receive information during deliberations from some outside source. *Galbreath,* 359 S.C. at 405, 597 S.E.2d at 848. The judge noted that no extraneous influence was present in the case at bar. In addition, Antwan concedes the misconduct alleged in this case is internal juror misconduct.

 If the alleged misconduct is internal, as we have in this matter, courts are more strict. *Hunter,* 320 S.C. at 88, 463 S.E.2d at 316. Internal influences involve information coming from the jurors themselves. *Galbreath,* 359 S.C. at 406, 597 S.E.2d at 849. Until 1995, the prohibition against juror testimony regarding allegations of internal jury misconduct remained intact. In *State v. Hunter,* our supreme court carved out an exception to this rule, holding that juror testimony is competent in cases involving internal misconduct where necessary to ensure due process, i.e., fundamental fairness. *Id.; see also Aldret,* 333 S.C. at 312, 509 S.E.2d at 813 (finding premature jury deliberations may affect fundamental fairness of a trial such that the trial court may inquire into such allegations and may consider juror affidavits in support of such allegations); *Ex Parte Greenville News,* 326 S.C. 1, 482 S.E.2d 556 (1997) (stating juror testimony regarding internal misconduct is generally inadmissible to impeach a verdict except when necessary to ensure fundamental fairness); *Hunter,* 320 S.C. at 88, 463 S.E.2d at 316 (noting juror's testimony was properly considered as basis for impeaching jury verdict, where juror claimed racial prejudice played role in determining defendant's guilt). In *State v. Franklin,* the court of appeals held:

> [W]e emphasize that the exception to the general rule against review of internal jury deliberations carved out in *Hunter* is a narrow one, limited by our supreme court to those few situations which implicate due process raising a question of fundamental fairness. . . . But the integrity of

the jury system is jeopardized any time a court finds it necessary to intrude into the internal deliberation process. Such an inquiry should not be lightly made.

*Franklin*, 341 S.C. at 562, 534 S.E.2d at 720.

After a three-day trial, the judge submitted the case to the jury. On the second morning of deliberations, the jury sent the trial court a note, asking: "Is it a possibility that the defendants go under oath and tell their side of the story?" After a brief discussion with counsel for Antwan and Troy, the trial court instructed: "[W]e cannot receive new evidence at this time. Please remember that you should not consider the fact that defendants did not testify." Counsel for Antwan and Troy concurred in the instruction. The jury resumed deliberations and returned a guilty verdict as to both defendants. Attorneys for Antwan and Troy moved for a new trial, arguing the jury "made it clear that they were considering things that [the trial court] specifically instructed them not to consider when they sent out the note saying that they wanted testimony from the defendants. Clearly, they were considering whether the defendants testified or not." The trial court denied the motion.

Lawyers for both Antwan and Troy filed a joint motion to impeach the verdict, take sworn testimony of jurors, and for a new trial. At the hearing, it was argued that the jurors "were basing their verdict, many of them, on the fact that the Zeiglers did not testify." The trial court considered the statements taken from the jurors by investigators hired by the Zeiglers, even though the statements were not sworn affidavits. The court ruled: "I just don't see any evidence that this jury made its decision based on an improper consideration of the defendants failing to testify."

Initially, we note that at the end of the trial the judge gave a detailed charge to the jury instructing them not to consider the fact that the defendants did not testify:

Because the defendant, ladies and gentlemen, in a criminal trial, is presumed to be innocent, as I told you, the law never imposes upon a defendant the burden or the duty of testifying, of calling any witnesses, or producing any evidence. The defendant in a criminal trial has the absolute right under the Constitution of the United States and the

State of South Carolina not to take the witness stand and testify. The exercise by a defendant of this right not to testify or present any evidence must not be considered by you in any way against the defendant, and should play no role whatsoever in your discussions or your deliberations. No inference of any kind may be drawn from the defendant's exercise of his constitutional right not to testify or present other evidence.

The judge reiterated this principle in a charge after receipt of the jury note.

Investigators for Antwan and Troy contacted eight jurors. Seven of the jurors provided statements, not affidavits, to the investigators. Three of the jurors expressed very clearly they based their decision in the case on the evidence presented at trial only. Although the other four jurors who provided statements all professed they thought the defendants should have testified, none of the jurors stated that was the reason they found the defendants guilty. Each of the four jurors declared their decision was based upon the evidence presented by the State at trial. The statements given by the four jurors support the trial court's finding that further investigation was not merited.

Antwan relies on *State v. Bryant*, 354 S.C. 390, 581 S.E.2d 157 (2003), for the proposition that the judge "should have heard the testimony from the jurors as requested in the motion." *Bryant* is distinguishable from the case *sub judice*. *Bryant* involved the questioning of jurors' family members by Horry County Police detectives before trial in a death penalty setting in a case in which the victim was a Horry County Police Department Officer. Unlike the present case, *Bryant* was an extraneous influence case.

Here, the trial judge considered the statements even though no sworn affidavits of the jurors were introduced at the hearings. The judge noted: "[W]e don't have any affidavits.... I'm not sure we really have any competent evidence before the court, but I'm considering what evidence we have as competent evidence, even though there are no affidavits." The extant precedent mandates the presentation of affidavits or sworn testimony of jurors. This evidentiary record is

devoid of the required showing in a case involving internal juror misconduct.

The trial court did not err in refusing to take sworn juror testimony and denying Antwan's motion for a new trial based on allegations of juror misconduct.

## CONCLUSION

For the reasons stated herein, Antwan Zeigler's conviction is

**AFFIRMED.**

BEATTY and SHORT, JJ., concur.