**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
In The Court of Appeals

The State, Respondent,

v.

Shantrez Alejandro Robertson, Appellant.

Appellate Case No. 2021-001405

―――――――――――

Appeal From Lexington County
Walton J. McLeod, IV, Circuit Court Judge

―――――――――――

Unpublished Opinion No. 2025-UP-002
Heard November 5, 2024 – Filed January 2, 2025

―――――――――――

**AFFIRMED**

―――――――――――

Elizabeth Anne Franklin-Best and Jillian Marie Lesley, of Elizabeth Franklin-Best, P.C., of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, and Assistant Attorney General Tommy Evans, Jr., of Columbia; and Solicitor Samuel R. Hubbard, III, of Lexington, all for Respondent.

―――――――――――

**PER CURIAM:** Shantrez Alejandro Robertson appeals his convictions for murder and attempted murder, arguing the circuit court erred in (1) denying his motion for a directed verdict and (2) instructing the jury on accomplice liability. We affirm.

**Facts and Procedural History**

On the night of July 5, 2015, and into the early morning hours of July 6, 2015, Brandon "Pedro" Jeffery, William Tyrone "Shine" Gantt, Dominique "Dee" Williamson, O'Brien "OB" Gilliam, and Andy "Teddy" Barnes attended a party at a local club called "The Spot." The group arrived in two vehicles and parked adjacently at the top of a hill.

Immediately upon entering the club, Jeffery saw Donovan Tirrell "Fresh" Brannon. When Jeffery saw Brannon "jumping around" and "throwing up signs," Jeffery pulled Gilliam out of the crowd and told him, "we ain't here for that." According to Jeffery, Robertson saw their exchange and "kind of bumped" Jeffery on his way over to Brannon. Shortly thereafter, Jeffery's group decided to leave.

As the group walked back to their vehicles, Jeffery, Gilliam, and Barnes heard Brannon say, "Where them p*ssy motherf*ckers at?"[1] Gantt responded to Brannon; Brannon replied, "not you"; and multiple shots were then fired. Jeffery was shot in both legs but was able to crawl under Williamson's vehicle. Barnes "dove" into his vehicle, retrieved his nine-millimeter, and returned fire.[2] Jeffery, Gilliam, and Barnes testified that Robertson, Brannon, and possibly a third individual jumped into the Grand Marquis driven by Antonio "Boosie" Stroman and left the scene.[3]

---

[1] According to Jeffery, both Brannon and Robertson were holding pistols at this time. However, Jeffery did not know who shot first and did not see anyone pull a trigger. Gilliam also saw Brannon holding a gun.

[2] Although Barnes testified he saw Brannon "coming up the hill, swinging his gun," he claimed he did not actually see Brannon fire the weapon. On cross, however, Barnes admitted Brannon shot first.

[3] Stroman gave three different statements, two of which indicated Robertson was in the vehicle with Stroman and Brannon. While the State provided evidence that Stroman made contradictory statements after the shooting, Stroman claimed he did

Williamson, Gilliam, and Barnes then helped Jeffery get out from under and into Williamson's car. They found Gantt dying on the ground behind Barnes's vehicle. Before leaving the scene, Barnes handed his gun and the gun found with Gantt's body to a bystander. Barnes later retrieved both guns and provided them to law enforcement.

Upon arriving at the nearby Hill View Truck Stop, a member of Jeffery's group called 911. Deputy Daniel Schirra of the Lexington County Sheriff's Department (LCSD) was the first to respond at 3:27 am. LCSD Deputy Timothy Franklin also responded to Hill View, where he found Jeffery with gunshot wounds to both legs—one to his ankle and the other in the knee/thigh area.

Deputy Schirra rode in the ambulance with Jeffery to Lexington Medical Center, and Jeffery named Robertson as a shooter. Jeffery told Deputy Schirra that when he and Gantt were leaving the club, Robertson and Brannon "[r]an up the hill screaming, 'Where them N words at?'" Gantt replied, "What N words?" Robertson then presented "a chrome and black handgun" and Brannon presented "an all-black handgun, and they began shooting in that direction." Jeffery recalled hearing "12 to 14 gunshots." While in the emergency room, Jeffery told Detective Franklin multiple times that he was shot by Robertson and Brannon.

Corporal Deepak Harpalani, of the Batesburg-Leesville Police Department, found Stroman in the back of a burgundy Grand Marquis parked at the Creek View Apartments.[4] Stroman had a gunshot wound to the neck, and Brannon was standing outside the vehicle. LCSD Investigator Michael Phipps processed the Grand Marquis at Creek View and collected Brannon's cell phone and gunshot residue test kit. Investigator Phipps also observed "projectile strike" damage to the car's rear door and trunk area as well damage to the "trunk lid and rear window." He discovered an empty Ruger nine-millimeter nearby.

---

not recall making the statements. He further alleged the police made certain promises and even threatened him to get him to change his statement.

[4] A witness who lived at Creek View saw a burgundy sedan park near her building on the night of the shooting. Four people were in the car, and the witness heard a female "screaming saying, [s]trip all your clothes off." Two other vehicles then pulled up—a truck and car—and two people from the burgundy sedan got into the other car before it drove away.

Following Brannon's arrest for disorderly conduct, LCSD Sergeant Shawn Spivey transported him to headquarters. There, Sergeant Spivey read Brannon his *Miranda*[5] rights, and Brannon stated he and Stroman went to The Spot together. Brannon claimed he returned fire in self-defense only after he and his friend were shot at while leaving the club. Brannon realized Stroman was hit "halfway from the club" because Stroman said, "I'm hit, cuz." He admitted the Ruger was his and that he threw the gun in the bushes when the police arrived.

A Lexington County grand jury subsequently indicted Robertson and Brannon for murder and attempted murder. The two men were tried jointly.

Jasmine Pringle, Robertson's former girlfriend, testified that Robertson called her in the early morning hours of June 6 and asked her to pick him up in a "country area." Robertson was with Tyrone "Boosie" White when Pringle arrived. Pringle's cousin, who was spending the night with Pringle at her apartment, was getting ready for work when she saw Pringle, Robertson, and another male enter the apartment between 5:30 am and 6:00 am on June 6.[6]

Forensic firearms identification expert Michelle Eichenmiller, of the South Carolina Law Enforcement Division, testified she was able to conclusively match or group all of the forty-one casings recovered by law enforcement to four firearms involved in the shooting, but two of the guns had not been found. Agent Eichenmiller received three firearms, a Walther Model P22 semi-automatic (associated with Gantt); a Jimenez Arms model JA9 semi-automatic nine-millimeter (associated with Barnes); and Brannon's Ruger model L9 semi-automatic nine-millimeter. Gantt's weapon "was excluded as firing any of the projectiles" submitted for SLED's analysis.

Of the forty-one cartridges, fifteen were fired from the same gun, which Agent Eichenmiller stated could have been a nine-millimeter Smith and Wesson. She testified the projectile collected from Gantt's left arm "was most consistent with a bullet or a jacket portion of a bullet loaded into nine-millimeter Ruger caliber

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[6] By contrast, Robertson claimed in his statement to a detective that he called Pringle between 2:00 am and 2:30 am and asked her to pick him up from The Spot; he further stated they got back to the apartment between 2:45 am and 3:15 am.

cartridges. It was a nine-millimeter bullet." She identified the projectile recovered from Gantt's right leg as most consistent with a 40-caliber or ten-millimeter auto bullet, which excluded the firearms recovered in the case. She concluded the projectile collected from Williamson's Dodge Charger was fired from the Ruger.

Dr. Janice Ross, who performed Gantt's autopsy, determined his manner of death was "exsanguination, which means to bleed out due to perforation of lungs, laceration of both lungs, due to a gunshot wound of the arm going into the chest." Dr. Ross noted Gantt suffered five gunshot wounds; she opined he could have been running and was likely "standing with all these wounds coming fairly quickly."

FBI Special Agent Robert Clayton Simmons, who was admitted as an expert in the analysis of historical cell phone records, determined Pringle's cell phone had no activity between 11:56 pm on June 5 and 4:31 am on June 6. Agent Simmons testified Robertson sent a message to Pringle at 4:11 am, which Pringle received at 4:28 am. The next incoming communication was from Boosie White at 4:34 am. Agent Simmons explained Pringle's phone utilized the cell tower near her apartment between 4:00 am and 4:59 am. Pringle's phone subsequently utilized the tower near I-20 and U.S. 1 at 5:06 am before returning to the cell tower near her apartment at 5:56 am. While Agent Simmons testified White's cell phone was using the tower near Pringle's apartment around 5:56 am, he was unable to establish a location for Robertson between 1:36 am and 4:28 am.

LCSD Detective Brannon Marthers testified that on the evening of June 4, Robertson texted Trenton Sampson stating, "I got a Smith and Wesson nine-millimeter brand new 17 shots." On June 5 at 3:49 pm, Robertson received a text message inquiring, "How much you want for the nine-millimeter?" Two minutes later, Robertson responded, "$250." On June 6 at 2:43 p.m., Robertson sent an outgoing text message to Pringle stating, " Baby, when your people leave, I need a place to lay low for a while."

Detective Marthers pulled surveillance footage from the truck stop, a three-minute drive from The Spot, for the period covering the two hours before the shootings. The footage shows Stroman, White, and Robertson—who is wearing a white t-shirt and white pants with stars—exiting a burgundy Grand Marquis.[7]

---

[7] At trial, Gilliam testified the man walking up the hill with Brannon wore a white t-shirt and he was one of the men who raised his hand before shots were fired. Jeffery testified Robertson wore white jogging pants with black stars that night.

At the conclusion of the four-day trial, the jury found Robertson guilty on both charges.[8]  The circuit court sentenced Robertson to thirty-two years for murder and a concurrent thirty years for attempted murder.

**Analysis**

## I.    Directed Verdict

Robertson argues the circuit court erred in denying his motion for a directed verdict because the evidence was insufficient to establish his involvement in the crimes charged.  We disagree.

"We review the denial of a directed verdict motion in a criminal case under the any evidence standard of review." *State v. Cain*, 419 S.C. 24, 33, 795 S.E.2d 846, 851 (2017).  When reviewing a directed verdict motion, courts view the evidence and all reasonable inferences in the light most favorable to the State.  *State v. Harris*, 413 S.C. 454, 457, 776 S.E.2d 365, 366 (2015).  "If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the Court must find the case was properly submitted to the jury." *Id.* (quoting *State v. Brandt*, 393 S.C. 526, 542, 713 S.E.2d 591, 599 (2011)).

Here, the State presented video evidence showing Stroman, White, and Robertson, who is wearing a white t-shirt and white pants with stars, getting out of a burgundy Grand Marquis at a truck stop three minutes from The Spot just hours before the shootings occurred.  Jeffery testified Robertson was wearing white jogging pants with black stars that night.  Moreover, Gilliam testified he saw a man wearing a white t-shirt walking up the hill with Brannon, and that he was one of the men who raised his hand before shots were fired.  Although some witnesses gave conflicting testimony, there is evidence in the record—most specifically Jeffery's statements to Deputy Schirra and Detective Franklin—indicating Robertson and Brannon both fired multiple shots at Jeffery and Gantt.

The State also presented phone records demonstrating Robertson was untruthful regarding his whereabouts at the time of the shootings.  And, the State presented evidence that fifteen of the forty-one cartridges recovered at the crime scene came from the same gun, which Agent Eichenmiller testified could have been a nine-millimeter Smith and Wesson.  Robertson's own text messages establish he

[8] Brannon was convicted as well.

was trying to sell "a Smith and Wesson nine-millimeter brand new 17 shots" just two days before the shootings.  Agent Eichenmiller further opined that a bullet recovered during Gantt's autopsy was likely fired from a Smith and Wesson nine-millimeter.  Finally, Robertson texted Pringle that he needed "a place to lay low for a while" approximately twelve hours after the shootings.

Even when we view all reasonable inferences in the light most favorable to Robertson, the evidence in the record reasonably tends to prove his guilt.  *See Harris*, 413 S.C. at 457, 776 S.E.2d at 366 ("If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the Court must find the case was properly submitted to the jury." (quoting *Brandt*, 393 S.C. at 542, 713 S.E.2d at 599)).  Our concern—and the circuit court's inquiry at the directed verdict stage—lies with the existence of evidence rather than its weight.  *See State v. Zeigler*, 364 S.C. 94, 101, 610 S.E.2d 859, 863 (Ct. App. 2005) ("When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight.").  Accordingly, we find the circuit court did not err in denying the directed verdict motion because there was both direct evidence and substantial circumstantial evidence from which a jury could properly conclude Robertson participated in the murder of Gantt and the attempted murder of Jeffery.  *See State v. Bennett*, 415 S.C. 232, 237, 781 S.E.2d 352, 354 (2016) ("[A]lthough the jury must consider alternative hypotheses, the court must concern itself solely with the existence or non-existence of evidence from which a jury could reasonably infer guilt.").

## II.   Jury Instruction

Robertson next argues the circuit court erred in instructing the jury on the doctrine of accomplice liability because there was insufficient evidence to support this jury charge.  We disagree.

"In reviewing jury charges for error, we must consider the court's jury charge as a whole in light of the evidence and issues presented at trial."  *Zeigler*, 364 S.C. at 106, 610 S.E.2d at 865.  "To warrant reversal, a trial judge's charge must be both erroneous and prejudicial."  *State v. Otts*, 424 S.C. 150, 155, 817 S.E.2d 540, 543 (Ct. App. 2018) (quoting *State v. Taylor*, 356 S.C. 227, 231, 589 S.E.2d 1, 3 (2003)).  "It is error to give instructions which may confuse or mislead the jury."  *Id.* (quoting *State v. Rothell*, 301 S.C. 168, 169-70, 391 S.E.2d 228, 229 (1990)).

"Ordinarily, the State convicts a defendant of a crime by proving that he personally committed the criminal act."  *State v. Sellers*, 442 S.C. 140, 148, 898 S.E.2d 116,

120 (2024).  "The doctrine of accomplice liability arises from the theory that 'the hand of one is the hand of all.'"  *State v. Reid*, 408 S.C. 461, 472, 758 S.E.2d 904, 910 (2014) (quoting 23 *S.C. Jur. Homicide* § 22.1 (2014)).  "Under an accomplice liability theory, 'a person must personally commit the crime or be present at the scene of the crime and intentionally, or through a common design, aid, abet, or assist in the commission of that crime through some overt act.'"  *State v. Campbell*, 443 S.C. 182, 193, 904 S.E.2d 441, 446-47 (2024) (quoting *State v. Condrey*, 349 S.C. 184, 194, 562 S.E.2d 320, 325 (Ct. App. 2002)).  While mere presence at a scene is insufficient to establish guilt, "[a]ny person who is present at a homicide, aiding and abetting, is guilty of the homicide as a principal, even though another does the killing."  *State v. Mattison*, 388 S.C. 469, 480, 697 S.E.2d 578, 584 (2010) (quoting *Zeigler*, 364 S.C. at 103, 610 S.E.2d at 864).

As discussed in Section I, *supra*, the evidence presented by the State demonstrates that Robertson, along with Brannon, was not only present during the shootings in this case, but he was an active participant, and he quite possibly fired the shots that killed Gantt and wounded Jeffery.  Because the State presented evidence sufficient to support an accomplice liability instruction, we find the circuit court correctly charged the jury regarding the "hand of one is the hand of all."  *See Zeigler*, 364 S.C. at 106, 610 S.E.2d at 865 ("In reviewing jury charges for error, we must consider the court's jury charge as a whole in light of the evidence and issues presented at trial."); *id.* ("A jury charge that is substantially correct and covers the law does not require reversal.").

**AFFIRMED.**

**WILLIAMS, C.J., and MCDONALD and TURNER, JJ., concur.**