748 S.E.2d 265

The STATE, Respondent,

v.

Timmy ROGERS, Appellant.

Appellate Case No. 2010–176426.

No. 5172.

Court of Appeals of South Carolina.

Heard June 5, 2013.

Decided Sept. 4, 2013.

Appellate Defender David Alexander, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General Alphonso Simon, Jr., all of Columbia; and Solicitor John Gregory Hembree, of North Myrtle Beach, for Respondent.

FEW, C.J.

A jury found Timmy Rogers guilty of murdering his paramour's husband, Fred Engel. Rogers argues the trial court erred when it refused to direct a verdict in his favor. We affirm.

### I. Background

In the early morning hours of April 22, 2008, police found Engel's body in the woods near a bank of mailboxes in the subdivision where he lived. A forensic pathologist determined the killer strangled Engel to death. Three months later, a grand jury indicted Rogers for murder.

At trial, the State theorized Rogers killed Engel because Rogers was having an affair with Engel's wife Sherry. Sherry testified for the State, claiming she and Rogers devised a plan

to kill Engel that they carried out the evening of April 21. Rogers moved for a directed verdict, which the trial court denied. After the jury convicted Rogers, the court sentenced him to thirty-five years in prison.

## II.  The Evidence

At trial, the State presented the following evidence to prove Rogers murdered Engel.

### A.  The Motive to Kill

Sherry testified the affair with Rogers began in May 2007 when she met him while visiting Kentucky. Thereafter, Sherry traveled from her home in Myrtle Beach to Kentucky to visit Rogers every month. She had family and a treating physician in Kentucky, which gave her excuses to visit. Throughout the affair, Sherry claimed Rogers frequently discussed "getting rid" of Engel "because he felt like [Engel] was going to take [her] away from him." In fact, she testified Rogers even tried to hire one of his family members to kill Engel. The family member, whom Sherry claimed "was a sharp shooter," ultimately refused Rogers' request. Although Sherry initially protested the plan to kill Engel, she claimed she "became more compliant with th[e] idea of having [Engel] killed" and discussed it with Rogers every day.

### B.  The Plan to Murder

According to Sherry's testimony, Rogers told her the morning of April 21, 2008, that "This was going to be the day that [Engel] died." Rogers was in Myrtle Beach that week, staying at a motel located ten miles from the Engels' home. Sherry drove to the motel, where she and Rogers discussed their intention to kill Engel. Knowing she could not change Rogers' mind, Sherry told him, "Well, if you're going to do it you go ahead and do it."

Rogers' plan was to park his red Chevrolet pickup truck in the parking area of the Engels' subdivision that night and hide in the bushes behind the mailboxes. Sherry was to call Rogers when Engel walked outside to check the mail. Rogers would lay in wait for Engel and shoot him when he approached the mailboxes. He told her he bought a gun from a man staying in the motel, but Sherry never saw the gun.

## C. The Murder

Sherry testified Rogers called her that night at 11:00 p.m. to tell her he was positioned at the mailboxes.[1] Sherry claimed she then asked Engel to check the mail, and when he left the house, Sherry called Rogers and told him, "He's leaving." She testified that when she hung up the phone, she knew she had "fulfilled her part of the agreement."

Rogers called her back later that night and said, "It's done." During that conversation, Sherry recalled "he was out of breath and . . . I could barely understand a lot of what he was saying. But I could tell he was in the woods cause of the way he was stomping and everything."

Around midnight, Sherry called Rogers to make sure he was out of the area and safely at his motel before she put the next part of their plan into action. He told her he made it back and, in Sherry's words, was "cleaning himself up from where he killed [Engel]." He had worn coveralls and boots Sherry had purchased for him, and Rogers told her he had to get "the blood off of his hands . . . and get[ ] his coveralls and . . . boot [off] because he had stepped in the blood."

After she got off the phone with Rogers, Sherry "sound[ed] the alarm." She testified she walked to the house of her next-door neighbors, Tom and Karen Rickerson, and told them she could not find Engel. Tom testified he drove around the neighborhood searching for Engel but could find no trace of him. At that point, Sherry told Tom they needed to go to the mailboxes because, as she explained to Tom, Engel took the mailbox key with him when he left. Sherry, however, claimed that she "knew something had happened at the mailbox"; she knew Rogers "was supposed to do it" there. When they arrived, Sherry saw "blood on the front of the [mail]boxes" and Engel's glasses laying on the ground. At that point, Sherry "had no doubt in [her] mind that [Engel] was dead," and she "knew who did it."

---

1. The State's expert in tracking cell phone calls presented cell phone records that are consistent with this phone call, but show the call being placed by Sherry to Rogers.

## D. Finding the Body

A police officer from the Horry County police department testified they found Engel's body in the woods approximately thirty feet from the mailboxes early the next morning. He also stated a shoestring was found around his neck, and it appeared Engel had been dragged face-down by his left arm into the woods. A pathologist with a local hospital in Myrtle Beach told the jury it would take significant strength to make the marks on Engel's neck that were left by the shoestring. He further testified Engel had a "fresh" head laceration that could have been inflicted by "[a]nything blunt that you either fall against or get hit with," and a defensive wound on his finger from pulling against the shoestring.

The police submitted twenty pieces of evidence for DNA swabs, but none contained Rogers' DNA. The police also made casts of footwear impressions found at the scene, but they yielded no useful information.

## E. Placing Rogers at the Scene

The State introduced the testimony of an employee who worked at the motel where Rogers stayed. She testified Rogers reserved a room from April 8 until May 5, 2008, which Sherry paid for in cash. She also confirmed that Rogers was a guest at the motel on the night of April 21, 2008. However, she testified Rogers checked out on April 30 and did not stay the full twenty-eight days he had reserved. The employee also testified Rogers drove a red Chevrolet S–10 pickup truck.

Kimberly Maluda, a resident of the subdivision where the Engels lived, testified that she passed a red Chevrolet S–10 pickup truck in the neighborhood on her way home from work the evening of April 21, 2008. She saw the same truck "back in" to a parking spot across from the mailboxes with the headlights off. However, she did not see the truck's license plate or driver. Maluda stated the truck was gone the next morning.

Michael Graham—an expert in tracking cell phone calls and text messages—testified about calls and text messages made from and received by Rogers' and Sherry's cell phones.[2]

2. Graham's testimony refers to a cell phone number with a 502 area code, later identified as Rogers' cell phone number, and a cell phone

According to Graham's testimony, there were at least fourteen phone calls and text messages sent between Sherry and Rogers on April 21, 2008. However, only two phone calls were made between Rogers and Sherry the next day, and the phone calls remained scarce thereafter.

Relying on Rogers' cell phone records, Graham testified to phone calls made between Rogers' and Sherry's cell phones the night Engel died and to Rogers' general location at the time of these calls based on which cell towers his phone accessed to make or receive those calls:

(1) Sherry called Rogers at 9:06 p.m., and Rogers' cell phone accessed a tower within the vicinity of Rogers' motel;

(2) Sherry and Rogers exchanged a series of phone calls and text messages between 9:41 and 9:44 p.m., and Rogers sent and received them by accessing three different towers that covered the subdivision where the Engels lived;

(3) Sherry placed a twenty-six-second phone call to Rogers at 10:35 p.m., and Rogers' cell phone accessed the tower covering the subdivision where the Engels lived;

(4) Sherry placed an eleven-second phone call to Rogers at 11:05 p.m., and Rogers' cell phone accessed the tower covering the subdivision where the Engels lived;

(5) Rogers placed a three-minute phone call to Sherry at 11:42 p.m., accessing the tower covering Rogers' motel; and

(6) Sherry placed a seven-and-a-half-minute phone call to Rogers at 12:03 a.m., and Rogers' cell phone accessed the tower covering his motel.

The State argued this evidence corresponded with Sherry's testimony regarding phone calls made between her and Rogers the night Engel died and put Rogers at the scene of the crime around the time Maluda claimed she saw a red truck in the neighborhood. Also, the State theorized that Rogers' cell phone accessed three different towers for the calls made between 9:41 p.m. and 9:44 p.m. because he was driving to the

number with an 843 area code, later identified as Sherry's cell phone number.

Engels' home at that time. However, Graham and another witness indicated the phone records showed only that the cell phones were used in the general area of the cell towers routing the calls; the information did not conclusively prove who was using the cell phones or pinpoint exactly where the phones were used.

## F. The Aftermath

Sherry testified to conversations she had with Rogers after Engel's death. She claimed she and Rogers spoke only twice the week after Engel's murder. One of those times, Rogers called and told her he had Engel's watch and keys and asked what he should do with them. Additionally, Rogers told her he had washed the steering wheel of his truck with bleach to remove Engel's blood from it, and he had painted his red truck gray.

Sherry testified that before the funeral, Sherry viewed Engel's body and noticed Engel's head was "all mashed in ... where he [had] been hit with something," and he had "a lot of scratching and bruising down his arm and on ... his right side." Sherry told the jury she found this odd because their plan did not include "beating [Engel] up or hitting him with anything." She also noticed there was no bullet wound on Engel's body. Afterward, Sherry asked Rogers how he killed Engel, and Rogers explained that Engel "was standing by the mailbox, and I came out behind him" and "put the gun to the back of his head and I pulled the trigger." Although Sherry admitted Rogers had never mentioned strangling Engel when they made their plan to kill him, she told the jury Rogers "had said something about a rope."

## III. Directed Verdict Analysis

Rogers argues the evidence discussed above is not sufficient to create a jury question as to his guilt because (1) the State presented no direct evidence he murdered Engel, and (2) the State's circumstantial evidence did not meet the standard for submitting a purely circumstantial evidence case to the jury.

In reviewing a denial of a directed verdict, we must view the evidence in the light most favorable to the State. *State v. Lollis*, 343 S.C. 580, 583, 541 S.E.2d 254, 256 (2001).

If there is any direct evidence, or if there is substantial circumstantial evidence, that reasonably tends to prove the defendant's guilt, we must find the trial court properly submitted the case to the jury. *State v. Odems,* 395 S.C. 582, 586, 720 S.E.2d 48, 50 (2011).

## A. The Existence of Direct Evidence

■■■■ We begin by addressing whether there was any direct evidence proving Rogers murdered Engel. Direct evidence "is based on personal knowledge or observation and . . ., *if true,* proves a fact without inference or presumption." *Black's Law Dictionary* 636 (9th ed.2009) (emphasis added). The presentation of direct evidence "immediately establishes the main fact to be proved." *State v. Salisbury,* 343 S.C. 520, 524 n. 1, 541 S.E.2d 247, 249 n. 1 (2001). Circumstantial evidence, on the other hand, is proof of a chain of facts and circumstances from which the existence of a separate fact may be inferred. *State v. Cherry,* 361 S.C. 588, 596, 606 S.E.2d 475, 479 (2004). Circumstantial evidence is "based on inference and not on personal knowledge or observation," *Black's Law Dictionary* 636 (9th ed.2009), and establishes "collateral facts from which the main fact may be inferred." *Salisbury,* 343 S.C. at 524 n. 1, 541 S.E.2d at 249 n. 1.

The State made no argument at trial or in its brief to this court as to the existence of any direct evidence of Rogers' guilt. In fact, the State asserted in its closing argument that all the evidence it relied on to convict him was circumstantial. In its brief, the State argued only that the circumstantial evidence proving Rogers guilty was substantial, and thus met the standard for submitting a case to the jury on purely circumstantial evidence. At oral argument, this court questioned Rogers' counsel regarding whether Sherry's testimony that Rogers said, "It's done," constituted direct evidence, to which counsel responded it was not. Later responding to this question, the State told the court that, "on second thought," it believed the statement was direct evidence. The State explained that because Sherry, the person who heard the statement and testified to it, interpreted it to mean Rogers had killed Engel according to their plan, this was direct evidence proving Rogers' guilt.

██ There are two additional pieces of evidence that arguably constitute direct evidence of Rogers' guilt—Sherry's testimony that Rogers told her in a phone call later that night he was cleaning himself up from where he killed Engel, and her testimony that Rogers told her "I put the gun to the back of [Engel]'s head and pulled the trigger." The definitions of direct and circumstantial evidence cited above tell us that direct evidence is that which requires only the factfinder's determination that the evidence is credible before it may find the existence of a disputed fact. Circumstantial evidence, on the other hand, requires the factfinder not only to determine that it believes the evidence, but also to make at least one additional inference from the evidence before concluding the fact has been proven. As to each of these three pieces of evidence, and all other evidence in this record, the jury could not find Rogers guilty of murder simply by believing any one piece of the evidence. At least one additional inference is necessary before any of the evidence proves murder.

██ As to the statement, "It's done," the jury had to infer what Rogers meant by both the words "it" and "done" before it could determine whether he confessed to murder. Thus, the jury could not find Rogers guilty of murder simply by determining whether it believed Sherry. While the circumstances in the case indicate persuasively that the mere statement "It's done" means he just killed Engel, the statement itself does not prove murder without further inference.

██ The statement "I put the gun to the back of [Engel]'s head and pulled the trigger" is not direct evidence that Rogers murdered Engel because we know from indisputable forensic evidence that it is not a true statement.[3] Engel died from strangulation, not from a gunshot to the head. Therefore, for the jury to conclude from this statement that Rogers is guilty of murder, it must infer that by saying he shot and killed Engel, he actually meant he strangled Engel to death.

██ Sherry's testimony that Rogers told her he was cleaning himself up from where he killed Engel is the most difficult of the three. If in fact Rogers told Sherry, "I am cleaning

---

3. Sherry also testified Rogers "told me he had shot him."

myself up from where I killed Engel," that would be direct evidence of murder. Sherry's actual testimony, however, was:

Yeah, he was telling me that he was getting the blood off his hands and everything and getting his coveralls and everything off. And his boot and everything because he had stepped in the blood, and he was cleaning his self up from where he killed Fred [Engel].

From this testimony, it is unclear whether Rogers actually said "from where I killed Engel" or whether that is what Sherry inferred he meant. The assistant solicitor did not follow up on this statement to clarify what Rogers actually said, but moved on to another topic. Thus, for the jury to conclude from this statement that Rogers murdered Engel, it not only must have found Sherry's testimony to be credible, but it must also have inferred from her testimony that Rogers *said* he "killed" Engel, not simply that Sherry thought that is what he meant.

■ We find the State's proof that Rogers is guilty of murder consisted entirely of circumstantial evidence, and therefore, we review the trial court's decision to deny his directed verdict motion under the "substantial circumstantial evidence" standard from *Odems.* 395 S.C. at 586, 720 S.E.2d at 50 (stating "if there is . . . *substantial* circumstantial evidence reasonably tending to prove the guilt of the accused, an appellate court must find the case was properly submitted to the jury"); *see also State v. Frazier,* 386 S.C. 526, 532, 689 S.E.2d 610, 613 (2010) (affirming denial of directed verdict because State offered "substantial circumstantial evidence of [defendant]'s guilt").

### B. The Sufficiency of the Circumstantial Evidence

■ The State presented the following circumstantial evidence at trial:

(1) Sherry's testimony that Rogers had an ongoing affair with her at the time Engel was killed;

(2) Sherry's testimony that she and Rogers conspired to kill Engel because Rogers "wanted [Engel] out of the way;"

(3) Maluda's testimony that she saw a red Chevrolet S–10 truck in the neighborhood that night, and the State's

evidence that Rogers drove a red Chevrolet S–10 pick-up truck;

(4) Cell phone records and the cell tower locations that indicated Rogers' cell phone was used in the vicinity of the crime scene around the time Maluda claims she saw a red Chevrolet S–10 truck in the neighborhood;

(5) Sherry's testimony that Rogers told her he would be waiting by the mailboxes, which were thirty feet from where the police found Engel's body and near where Maluda saw the truck park, and Sherry's testimony that when she talked to Rogers that night, he told her he was "in place" behind the bushes next to the mailboxes;

(6) Sherry's testimony that she was to call, and did in fact call, Rogers when Engel left the house, and cell phone records corroborating that she made a call to Rogers at 11:05 p.m.;

(7) Sherry's testimony that when Rogers called her later that night, he stated, "It's done;"

(8) Sherry's testimony that during this phone call, it sounded like Rogers was in the woods and was out of breath, which is consistent with testimony that Engel's body was dragged to the woods and that it took significant strength to strangle Engel;

(9) Sherry's testimony that she called Rogers around midnight to make sure he was away from the scene, which is consistent with cell phone records showing Sherry made a call to Rogers at 12:03 a.m.;

(10) Sherry's testimony that during this phone call, Rogers indicated he was at the motel washing off Engel's blood and taking off his coveralls and boots, which is consistent with cell tower locations that indicated his phone was used in the vicinity of his motel, and with Sherry's testimony that he told her he wore coveralls and boots when he committed the crime;

(11) Sherry's cell phone records showing she communicated with Rogers at least fourteen times the day Engel died, but their communication became very limited thereafter;

(12) Sherry's testimony that Rogers cleaned the interior of his truck with bleach sometime after the incident;

(13) Testimony that Rogers painted the exterior of his truck before Engel's funeral;

(14) Sherry's testimony that after Engel's death, Rogers mentioned "something about a rope" in connection with Engel's death; and

(15) Sherry's testimony that Rogers asked her before the funeral what he should do with Engel's watch, which is consistent with the State's theory that the watch came off when Rogers dragged Engel's body into the woods by his left arm, and with Sherry's testimony that Engel wore a watch on his left wrist.

We find this evidence meets the "substantial circumstantial evidence" requirement and reasonably tends to prove that Rogers killed Engel, and thus was sufficient for the trial court to submit the case to the jury.

## C. Rogers' Other Arguments

■ Rogers makes several arguments, however, that a directed verdict was required based on decisions of our supreme court regarding the sufficiency of purely circumstantial evidence. These arguments challenge the State's evidence by isolating pieces of evidence and contending those individual pieces are insufficient to prove his guilt. We acknowledge the State's evidence, when separated out and viewed individually, may merely raise a suspicion of Rogers' guilt. *See Odems*, 395 S.C. at 586, 720 S.E.2d at 50 (stating directed verdict appropriate when the evidence merely raises a suspicion of defendant's guilt); *State v. Schrock*, 283 S.C. 129, 132, 322 S.E.2d 450, 452 (1984) (stating a "trial judge should grant a directed verdict motion when the evidence merely raises a suspicion that the accused is guilty"). Circumstantial evidence, however, gains its strength from its combination with other evidence, and all the circumstantial evidence presented in a case must be considered together to determine whether it is sufficient to submit to the jury. *See Frazier*, 386 S.C. at 532, 533, 689 S.E.2d at 613, 614 (viewing circumstantial evidence "collectively" and "as a whole" to hold directed verdict properly denied); *Cherry*, 361 S.C. at 595, 606 S.E.2d at 478 (finding the circumstantial evidence, when combined, was "sufficient for the jury to infer [guilt]").

Keeping this in mind, we turn to Rogers' first argument—that the State's evidence failed to place him at the scene of the crime. Rogers' argument is based on a line of cases in which our supreme court held, in part, the State's lack of evidence placing the defendant at the crime scene necessitated a directed verdict.[4] He claims the trial court was required to direct a verdict based on the holdings in these cases because the State's evidence does not prove he was at the mailboxes when Engel went to check the mail. Specifically, Rogers challenges (1) the cell phone and cell tower evidence and (2) Maluda's testimony regarding the red truck she saw that evening as insufficient to place him at the scene of the crime. We agree neither the cell tower evidence nor Maluda's testimony, standing alone, conclusively places Rogers at the scene of the crime. The cell tower evidence proved only that Rogers' cell phone was used in the general vicinity of the cell towers—not that Rogers called or that he was at the mailboxes when Engel checked the mail—and Maluda's testimony established only that she saw the same type of vehicle driven by Rogers parked near the mailboxes that night—not that Rogers, or his truck, was there.

▬▬▬▬▬ Rogers' argument, however, is flawed for two reasons. First, a directed verdict is not required merely because the State cannot conclusively show the defendant was at the crime scene at the relevant time. As the supreme court stated in *Frazier*, the holdings in *Arnold*, *Martin*, and *Schrock* did not alter or increase "the sufficiency of evidence standard a trial court is to apply in a case based on circumstantial evidence." *Frazier*, 386 S.C. at 532, 689 S.E.2d at 613. The court explained this is because those holdings were based on

4. *See State v. Bostick*, 392 S.C. 134, 141–42, 708 S.E.2d 774, 778 (2011) (reversing denial of directed verdict and noting "[n]o direct evidence linked [the defendant] to the crime scene"); *State v. Arnold*, 361 S.C. 386, 390, 605 S.E.2d 529, 531 (2004) (holding directed verdict proper, in part, because no evidence directly proved defendant was at the scene of the crime); *State v. Martin*, 340 S.C. 597, 602–03, 533 S.E.2d 572, 574–75 (2000) (reversing denial of directed verdict and stating "[m]ost significantly, the State's evidence failed to place either defendant inside the apartment"); *Schrock*, 283 S.C. at 132, 134, 322 S.E.2d at 452, 453 (reversing denial of directed verdict and relying, in part, on lack of evidence placing defendant at the scene of the crime).

the State's failure to present *any* evidence placing the defendant at the scene, not the State's inability to provide conclusive proof on that point. *Id.* Second, this evidence, when considered together and in combination with other evidence—particularly Sherry's testimony[5] that Rogers told her he was there that night waiting near the mailboxes—is sufficient to place Rogers at the scene of the crime at the relevant time, and thus to distinguish this case from *Arnold, Martin,* and *Schrock.*

Rogers also challenges the evidence of his affair with Sherry, arguing this case is distinguishable from *State v. Frazier* because evidence of Rogers' and Sherry's affair does not prove Rogers was at the scene of the crime or committed the murder. In *Frazier,* the defendant argued the State's evidence was insufficient to place him at the murder scene. 386 S.C. at 531, 689 S.E.2d at 613. The court disagreed and listed seven pieces of circumstantial evidence[6]—one being evidence of an ongoing affair between the defendant and the victim's wife—and found "[t]his evidence, when viewed collectively,

5.  Although Rogers questioned Sherry's credibility, we consider only the existence or non-existence of evidence, not witness credibility, in reviewing the denial of a directed verdict. *See State v. Cherry,* 348 S.C. 281, 286, 559 S.E.2d 297, 299 (Ct.App.2001) (en banc) (affirming trial court's denial of directed verdict "without passing on the weight of the evidence"), *aff'd in result,* 361 S.C. at 594, 606 S.E.2d at 478 (stating "[w]hen the state relies exclusively on circumstantial evidence and a motion for directed verdict is made, the circuit court is concerned with the existence or nonexistence of evidence, not with its weight"); *State v. Scott,* 330 S.C. 125, 131 n. 4, 497 S.E.2d 735, 738 n. 4 (Ct.App.1998) (finding circumstantial evidence was substantial even though witnesses' testimony conflicted because the jury, not the court, assesses witness credibility and weighs testimony).

6.  The court found the following evidence to constitute substantial circumstantial evidence: (1) the ongoing affair between the defendant and the victim's wife; (2) the victim was shot twice at point-blank range while the victim's wife was unharmed; (3) a witness overheard the defendant and victim's wife discussing a trip to the beach where the victim was shot; (4) the defendant requested three days off from work a week before the murder and the murder occurred on the second of those three days; (5) the defendant borrowed a friend's car for those three days; (6) the defendant attempted to fight the victim days before the murder; and (7) two witnesses observed the defendant "lurking around the murder scene just before the murder was committed," and both independently identified the defendant in a photographic lineup. 386 S.C. at 531–32, 689 S.E.2d at 613.

presented a jury question as to [the defendant]'s guilt." 386 S.C. at 531–32, 689 S.E.2d at 613. In listing this evidence, particularly the evidence of the affair, the court did not mean to imply that each piece of evidence proved the defendant was at the scene of the crime. Instead, the court evaluated the seven pieces of evidence in combination with one another and determined they "collectively" met the "substantial circumstantial evidence" test. *Id.* Thus, Rogers' reliance on *Frazier* is misplaced because here, as in *Frazier*, evidence of the affair is merely one piece of the evidence that collectively was sufficient to submit the case to the jury.

Nonetheless, Rogers argues *Frazier* is distinguishable because there were no witnesses placing Rogers at the crime scene—especially considering Maluda could not identify the driver or license plate of the red Chevrolet S–10 truck—and there was no evidence indicating Rogers had a prior confrontation with Engel. The absence of this particular evidence means this case is different from *Frazier*, but it does not mean the case is distinguishable. In fact, the evidence in this case is stronger than in *Frazier* because Sherry testified to (1) Rogers' plan to kill Engel, (2) Rogers' approximate whereabouts before and after the murder that are corroborated by cell phone records and other testimony, and (3) inculpatory statements and actions made by Rogers. While there was no evidence of any confrontations between Rogers and Engel and there were no eyewitnesses conclusively placing Rogers at the mailboxes, evidence of the affair and the additional evidence presented at trial, *"when viewed collectively,* presented a jury question" as to Rogers' guilt. 386 S.C. at 532, 689 S.E.2d at 613 (emphasis added).

Rogers next argues the statement, "It's done," failed to show he actually committed the act of strangling Engel, especially considering Sherry testified Rogers shot, not strangled, Engel. He relies on *Martin* and argues that his potentially inculpatory statement is not "per se substantial circumstantial evidence." In *Martin*, the defendant's girlfriend testified that when she asked the defendant and codefendant why they were late picking her up from work, the defendant responded, "some shit happened," and the codefendant added, "somebody may have died tonight." 340 S.C. at 600, 533 S.E.2d at 573. Later that morning, the victim was found dead in his apartment, drowned in a pot of water. 340

S.C. at 600, 533 S.E.2d at 573. Despite these inculpatory statements, the supreme court reversed the trial court's denial of a directed verdict. 340 S.C. at 602–03, 533 S.E.2d at 574–75. Considering the evidence as a whole in that case, the court determined "the State failed to place [Martin] at the scene of the crime or show his participation in the killing." 340 S.C. at 602, 533 S.E.2d at 574.

This case is distinguishable from *Martin* for two reasons. First, Rogers' statement, "It's done," is stronger evidence than the inculpatory statements in *Martin*. Rogers' statement did not merely reveal Engels' death, but tied itself to Rogers' elaborate scheme of murder because it informed his co-conspirator that he had executed *their* plan to kill Engel. Also, the statement was corroborated by other details of that conversation, particularly Rogers being out of breath and in the woods, and was consistent with the State's theory that Rogers killed Engel and then dragged his body into the woods. Second, this case is distinguishable from *Martin* because Rogers' inculpatory statements are part of a large body of evidence not present in that case. Rogers' attempts to isolate this and other single pieces of evidence [7] and argue each one alone does not constitute substantial circumstantial evidence are misplaced. The supreme court has consistently evaluated the circumstantial evidence in a case as a whole, not in isolation from other evidence. *See, e.g., Frazier*, 386 S.C. at 531–32, 533, 689 S.E.2d at 613, 614; *Cherry*, 361 S.C. at 594–95, 606 S.E.2d at 478; *State v. Buckmon*, 347 S.C. 316, 323–24, 555 S.E.2d 402, 405–06 (2001). As we have discussed, the State presented evidence of Rogers' guilt that meets the substantial circumstantial evidence test, and the trial court properly submitted the case to the jury.

## IV. Conclusion

For the reasons set forth above, the trial court's refusal to grant Rogers' motion for a directed verdict is **AFFIRMED.**

GEATHERS and LOCKEMY, JJ., concur.

---

7. Rogers also challenges the following pieces of evidence, individually, in his brief: (1) the connection between Rogers owning a pair of boots and the shoe impressions found at the scene, (2) the alleged conspiracy to kill Engel, and (3) the testimony that Rogers cleaned the interior of his truck and painted the exterior after Engel's death.