**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Robert Lee Belcher, III, Appellant.

Appellate Case No. 2023-001378

Appeal From Greenville County
Perry H. Gravely, Circuit Court Judge

Unpublished Opinion No. 2026-UP-247
Heard April 9, 2026 – Filed May 20, 2026

**AFFIRMED**

Senior Appellate Defender Lara Mary Caudy, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General W. Jeffrey Young, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, all of Columbia; and Solicitor Cynthia Smith Crick, of Greenville, all for Respondent.

**PER CURIAM:**  Robert Belcher, III, appeals his convictions and respective sentences for murder, armed robbery, first-degree burglary, conspiracy, petit larceny, and possession of a weapon during the commission of a violent crime.  On appeal he argues the trial court erred by (1) failing to direct a verdict of acquittal on all counts and (2) refusing to give his requested jury instruction regarding accomplice liability.  We affirm.

## FACTS/PROCEDURAL HISTORY

In December 2017, Cedric McKinney lived with his friend, Jermaine Bruster, at an apartment complex in Greenville.  On the evening of December 31, McKinney and Bruster were in the apartment getting ready to attend a New Year's Eve celebration.  McKinney left Bruster in their apartment and walked across the street to the apartment where the party was being held.

After McKinney left, several other people stopped by the apartment to see Bruster.  Bruster's fiancée tried to call Bruster, but he did not answer.  Shortly after, McKinney walked back to his apartment and discovered Bruster lying on the floor of the living room, just inside the door, with a gunshot wound to his chest; the apartment also appeared to have been ransacked.  Paramedics and law enforcement responded to the 911 call, but Bruster died at the scene.

When McKinney returned to the apartment after the shooting, he noticed that his change jar—a purple and orange snack container—holding approximately $75 to $100 was missing from his bedroom.  The lid to the container was found on the floor of his bedroom.  Based on this information, Investigator Chad Maltby subpoenaed records for two Coinstar machines in the vicinity of the apartment.  The records showed a transaction that occurred at a nearby Ingles shortly after the incident.  Maltby then collected video footage from that Ingles and identified Raymond Martinez, Jr., Belcher's co-defendant, using the Coinstar machine to cash in $71.72 worth of change.  Martinez was carrying the change in a purple and orange container with no lid.

An informant at the detention center led Maltby to identify three other people who had been with Martinez on the night of the incident—Belcher, Kirk Porter, and Keyla "Kiki" Mansell.  Mansell and Belcher's then-girlfriend, Sherry McBee, were neighbors at an apartment complex on Crestwood Forest Drive (Crestwood Apartments), approximately two miles from McKinney and Bruster's apartment.  Maltby obtained surveillance video from the Crestwood Apartments on the night of

the incident and identified a gray Mercedes sedan belonging to Porter's girlfriend coming and going around the time the incident occurred.

Maltby interviewed McBee, who called Belcher and asked him why the police were at her apartment. During that conversation, which Belcher was unaware that Maltby was privy to, he confirmed he knew Martinez, Mansell, and Porter. However, when Belcher called Maltby himself an hour or so later, Belcher denied knowing any of them. Belcher also could not provide any information about his whereabouts on New Year's Eve, claiming that he "smokes weed" and could not remember where he was or what he did. Investigators collected Belcher's phone upon his arrest and determined he had Mansell and Porter's phone numbers among his frequent contacts.

McBee testified that Belcher lived with her at Crestwood Apartments in December 2017 and that Belcher, Martinez, and Mansell were friends. McBee recalled that Belcher did not return home until after midnight on New Year's Eve in 2017, and when he did, he was acting "strangely" and "really, really emotional." She stated that the next morning, she was using Facebook and learned that Bruster had died; she asked Belcher if he knew Bruster and turned her phone around to show him a picture.[1] She testified that when she did, "it was like [Belcher] was stuck . . . [h]e wasn't breathing. He wasn't blinking. He was just stuck." According to McBee, shortly afterwards, in January, she kicked Belcher out of her home because his energy was "intense." She explained that one day she found him crying on the edge of her bed and he repeatedly told her that he had done something bad. McBee stated that Belcher asked her whether she would "tell on him" if he had killed someone she knew. She asked him to explain what he was talking about, but he refused.

Porter, who pleaded guilty to voluntary manslaughter, testified against Belcher and Martinez at their joint trial.[2] According to him, he was with Mansell, Belcher, and Martinez on New Year's Eve when Mansell said she "knew a lick" and the person "might have some cocaine and money." The group left Mansell's apartment with Porter driving the silver Mercedes and parked at a church off of Poinsett Road, approximately a five-minute drive from Crestwood Apartments. Porter testified that Belcher and Martinez, both carrying guns, got out of the car to "go rob somebody," while he and Mansell stayed behind in the car. He explained that the

---

[1] Bruster was a friend of McBee's family.
[2] The remaining charges against Porter for this incident and others were dismissed; he had not been sentenced at the time of trial.

person they were going to rob lived "somewhere down the road from the church," although he could not say exactly where Belcher and Martinez went when they got out of the car. Porter stated that he and Mansell sat in the car for "some time," and then he drove down the road toward McKinney and Bruster's apartment complex and picked up Belcher and Martinez. He testified Martinez was carrying a clear container of change with a purple top on it. Porter further testified that Belcher and Martinez reported that they had to wait for someone else in the apartment to leave before they could enter. He stated that they were acting normal when they got back into the car.

Porter testified that he returned to Crestwood Apartments and dropped off Mansell and Belcher. He then drove Martinez to the Ingles to use the Coinstar machine; however, Martinez told him the machine was broken and he was unable to get any money. Porter testified he learned the next day that the man inside the home they had planned to rob had died, but he did not know the man had been shot.

Belcher moved for a directed verdict, which was denied. At the jury charge conference, Belcher requested a specific instruction on accomplice testimony, arguing it was a standard jury instruction in federal court. The requested charge was as follows:

> You have heard testimony from [Porter] who is an "accomplice" or someone who said he or she participated in the commission of this crime.
>
> The testimony of an accomplice should be received with great care and caution.
>
> You should consider whether the particular accomplice is testifying truthfully or falsely in order to obtain a favorable recommendation by the government in the sentencing in his own case.
>
> You should not convict the defendant on the uncorroborated testimony of an accomplice, unless you believe that testimony beyond a reasonable doubt.

The State objected, arguing the instruction was an improper comment on the facts and the "spirit" of the requested charge was encompassed in the court's credibility charge. The court denied the requested charge, finding it was an improper charge

on the facts and "put[] an angle from the [court]'s perspective" on what or who to believe. However, the court gave a thorough charge on credibility.

The jury convicted Belcher of all counts, and the trial court sentenced him to an aggregate sentence of forty-five years' imprisonment. This appeal followed.

## DIRECTED VERDICT

We hold the trial court did not err by denying Belcher's directed verdict motion. *See State v. Edwards*, 384 S.C. 504, 508, 682 S.E.2d 820, 822 (2009) (explaining that in criminal cases, this court sits to review errors of law only and is bound by the trial court's factual findings unless they are clearly erroneous); *State v. Zeigler*, 364 S.C. 94, 101, 610 S.E.2d 859, 863 (Ct. App. 2005) ("When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight."); *id.* ("On appeal from the denial of a directed verdict in a criminal case, an appellate court must view the evidence in the light most favorable to the State."); *id.* at 102, 610 S.E.2d at 863 ("If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, an appellate court must find the case was properly submitted to the jury.").

First, we acknowledge that Porter is not an unbiased witness, as he received a significant reduction of his charges in this case and others in exchange for his testimony. Also, Porter testified he did not leave the car, and therefore, his testimony only placed Belcher near the crime scene at the time of the incident, but not directly on the scene. Thus, the State's evidence against Belcher was circumstantial, and its case hinged largely on whether the jury would believe Porter's testimony. *See State v. Rogers*, 405 S.C. 554, 564, 748 S.E.2d 265, 270 (Ct. App. 2013) (explaining that circumstantial evidence "requires the factfinder not only to determine that it believes the evidence, but also to make at least one additional inference from the evidence before concluding the fact has been proven"); *State v. Grippon*, 327 S.C. 79, 83-84, 489 S.E.2d 462, 464 (1997) ("The law makes absolutely no distinction between the weight or value to be given to either direct or circumstantial evidence." (quoting 1 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 12.04 (4th ed.1992))). However, viewing all of the evidence presented at trial in the light most favorable to the State, we believe "the evidence presented [wa]s sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt." *State v. Bennett*, 415 S.C. 232, 237, 781 S.E.2d 352, 354 (2016). Porter's testimony must be considered along with Belcher's false statement to Maltby that he did not know Mansell, Porter, or

Martinez; his inability to give an alibi; and McBee's testimony that, after seeing Bruster's picture and being told he had been killed, Belcher asked her if she would "tell on him" if he had killed someone she knew.[3]  *See Rogers*, 405 S.C. at 567, 748 S.E.2d at 272 ("Circumstantial evidence . . . gains its strength from its combination with other evidence, and all the circumstantial evidence presented in a case must be considered together to determine whether it is sufficient to submit to the jury."); *State v. Thompson*, 278 S.C. 1, 10, 292 S.E.2d 581, 587 (1982), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991) ("False and conflicting statements . . . are evidence of guilty knowledge and intent."); *Bennett*, 415 S.C. at 237, 781 S.E.2d at 354 ("[A]lthough the *jury* must consider alternative hypotheses, the court must concern itself solely with the existence or non-existence of evidence from which a jury could reasonably infer guilt.").  Further, the determination of Porter's credibility was "solely within the province of the jury," and we are concerned only with the existence of the testimony, not the weight to be given to it.  *State v. Scott*, 330 S.C. 125, 131 n.4, 497 S.E.2d 735, 738 n.4 (Ct. App. 1998) ("That the witnesses equivocated goes to their credibility and the weight to be given their testimony, matters solely within the province of the jury."); *Rogers*, 405 S.C. at 569 n.5, 748 S.E.2d at 273 n.5 ("[W]e consider only the existence or non-existence of evidence, not witness credibility, in reviewing the denial of a directed verdict.").

Finally, Belcher's case is distinguishable from other cases in which the appellate courts found the State produced evidence which raises only a mere suspicion of the defendant's guilt.  For example, in *State v. Lollis*[4] and *State v. Odems*[5], not only was there a dearth of inculpatory evidence, but the State's witnesses actually offered *exculpatory* evidence regarding the respective defendants.  *See Lollis*, 343 S.C. at 585, 541 S.E.2d at 257 (pointing out that Lollis's wife "admitted to starting

---

[3] We also take note of Belcher's conversation with Maltby, wherein Maltby asked about Belcher's alibi, and Belcher stated he could not remember where he had been on the night of the murder.  As Maltby pointed out in his testimony, their conversation took place in February, just two months after the day in question; he was asking about Belcher's whereabouts during a recent holiday celebration, not, for example, a run-of-the-mill Tuesday several years prior.  Additionally, Porter testified that when he picked up Belcher and Martinez after the robbery, they reported that they had to wait for someone else to leave the apartment before they could enter, which aligns with the series of events pieced together by Maltby during his investigation.

[4] 343 S.C. 580, 541 S.E.2d 254 (2001).

[5] 395 S.C. 582, 720 S.E.2d 48 (2011).

the fire without assistance from Lollis, and without his knowledge" and "[t]he State presented no evidence of an agreement between them"); *Odems*, 395 S.C. at 588, 720 S.E.2d at 51 (noting that although Odems was found in and fled from the getaway car along with two other men approximately ninety minutes after the burglary at issue, the sole eyewitness "described only two men at the scene" and a co-defendant testified that he just happened to run into Odems at a convenience store shortly after the robbery and Odems asked for a ride). Other directed verdict cases affirm on similar facts as found here. *See Rogers*, 405 S.C. at 557-63, 748 S.E.2d at 267-70 (affirming the denial of the directed verdict motion largely on the testimony of a single witness—the woman with whom Rogers was having an affair at the time her husband was killed and who admitted to helping Rogers plan the murder).

## JURY INSTRUCTION

We hold the trial court did not err by refusing to give the requested jury charge. *See State v. Brooks*, 428 S.C. 618, 625, 837 S.E.2d 236, 239 (Ct. App. 2019) ("An appellate court will not reverse a trial court's decision regarding a jury instruction unless there is an abuse of discretion."); *State v. Simmons*, 384 S.C. 145, 178, 682 S.E.2d 19, 36 (Ct. App. 2009) ("To warrant reversal, a [trial] court's refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant."). We acknowledge Belcher's argument that the court erred by denying his requested jury charge because the State's case was circumstantial and relied heavily on Porter's testimony. However, we disagree that the trial court erred.

First, we find the requested jury charge would have been an improper comment on the facts. *See State v. Stukes*, 416 S.C. 493, 499, 787 S.E.2d 480, 483 (2016) ("[I]t is not within the province of the [trial] court to express an opinion to the jury on its view of the facts."). As the trial court explained in its reasoning for denying the request, the requested charge would have improperly emphasized Porter's testimony. *See id.* ("By addressing the veracity of a victim's testimony in its instructions, the trial court emphasizes the weight of that evidence in the eyes of the jury."). Porter was the only accomplice who testified and much of his testimony was uncorroborated. Porter also had numerous charges dismissed in exchange for his testimony. Therefore, giving the requested instruction would single Porter out from the other witnesses and serve as a comment on his veracity. *See State v. Brown*, 443 S.C. 196, 199-201, 904 S.E.2d 448, 449-51 (2024) (holding that by allowing the requested inferred malice instruction, the trial court "improperly elevated and commented to the jury upon a particular fact"). We acknowledge that the requested charge is common in federal district courts.

However, the requested charge is similar to the charge requested in *State v. Mikell*, which our supreme court found improper. 257 S.C. 315, 328-29, 185 S.E.2d 814, 820 (1971) (affirming the trial court's refusal to give a requested charge that instructed, among other things, that "[t]he testimony of an accomplice or co-conspirator must be weighed with great care and be scrutinized closely, carefully[,] and cautiously" because such a charge is an improper comment on the facts).

Additionally, the credibility charge given by the trial court sufficiently covered the substance of Belcher's request. *See State v. Mattison*, 388 S.C. 469, 479, 697 S.E.2d 578, 583 (2010) ("[T]here is no error if the charge actually given sufficiently covers the substance of the request." (quoting *State v. Austin*, 299 S.C. 456, 458, 385 S.E.2d 830, 831 (1989))). The proposed charge would have instructed the jury that accomplice testimony should "be received with great caution and care" and the jury should consider whether an accomplice was "testifying truthfully or falsely in order to obtain a favorable recommendation by the government in the sentencing in his own case." The trial court gave the standard witness credibility charge, which included a statement that the credibility determination was for the jury and the jury could accept or reject different portions of a witness's testimony. Significantly, the trial court specifically stated the jury could "consider how a particular witness looked on the stand, *whether they had a particular bias,* [and] *whether they had some interest in the outcome*" in determining whether to believe that witness. Because the charge given instructed the jury that it determines who to believe and may consider if a particular witness had an interest in the outcome, we find it sufficiently covered Belcher's request. *See State v. Bamberg*, 270 S.C. 77, 82, 240 S.E.2d 639, 641 (1977) (holding that it was within a trial court's discretion to "refuse[] to instruct the jury to take into consideration the interest or bias of the witness").

Because we hold the trial court did not err by refusing to give Belcher's requested charge, we do not find it necessary to determine whether the refusal was prejudicial. *See Simmons*, 384 S.C. at 178, 682 S.E.2d at 36 ("To warrant reversal, a [trial] court's refusal to give a requested jury charge must be both erroneous *and* prejudicial to the defendant." (emphasis added)).

**AFFIRMED.**

**THOMAS, MCDONALD, and TURNER, JJ., concur.**